IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| FREEMAN MANAGEMENT CORPORATION, a Tennessee corporation, and FREEGARD PARTNERS I, FREEGARD PARTNERS III, FREEGARD PARTNERS IV, FREEGARD PARTNERS V, FREEGARD PARTNERS VI, and FREEGARD PARTNERS VIII, each a Tennessee general partnership, | ) ) ) ) ) ) ) ) ) ) | Case No. 3:06-00736 Judge Wiseman Magistrate Bryant |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| SHURGARD STORAGE CENTERS, LLC, and PUBLIC STORAGE, INC., | ) ) ) | |
| Defendants. | ) | |

**DEFENDANTS' REPLY BRIEF IN SUPPORT
OF THE MOTION TO DISMISS**

Defendants Shurgard Storage Centers, LLC ("Shurgard, LLC") and Public Storage, Inc. ("Public Storage") submit this memorandum in reply to Plaintiffs' Response To Motion To Dismiss (D.E. 22, hereinafter "Response" or "Resp.") and in support of their contemporaneously filed Motion to Dismiss Plaintiffs' Dissociation Claims.

**Argument**

A motion to dismiss should be granted where no set of facts are alleged that would entitle the plaintiff to relief. "Although a motion to dismiss should be granted only if the plaintiff can prove no set of facts which would entitle her to relief, [the] court should not assume facts that were not pled." *Harvey v. Great Seneca Fin. Corp.*, 453 F.3d 324, 328 (6th Cir. 2006). Moreover, "[t]he court need not accept legal conclusions or unwarranted factual inferences as

true." *Power & Tel. Supply Co. v. SunTrust Banks, Inc.*, 447 F.3d 923, 930 (6th Cir. 2006). Despite the filing of an Amended Complaint, Plaintiffs still fail to allege facts sufficient to sustain Counts V, VI and VII, and Counts I, VI and VII with respect to FMC. Inasmuch as Plaintiffs assert new allegations in the Amended Complaint that Shurgard Storage Centers, Inc. ("Shurgard, Inc.") dissociated from the joint ventures, those allegations fail to assert a claim upon which relief can be granted. Therefore, the Court should dismiss all of these claims.

## I.     COUNTS V, VI, AND VII SHOULD BE DISMISSED.

**A.     Accepting the allegations of the Amended Complaint, Public Storage and Shurgard, Inc. should be treated as a single entity for purposes of the conspiracy, inducement and interference claims.**

Plaintiffs object that the privilege recognized in *Waste Conversion Sys., Inc. v. Greenstone Indus., Inc.*, 33 S.W.3d 779 (Tenn. 2002), is inapplicable primarily because the merger had not yet consummated and, therefore, Shurgard, Inc. was under no obligation to obey Public Storage's commands. Plaintiffs allege that Public Storage used the pending merger transaction as "leverage" to "coerce" Shurgard, Inc. into taking actions that it otherwise would not have taken, and that Public Storage, therefore, had "*de facto* control" over Shurgard, Inc. (Resp. at 10; Am. Compl. ¶¶ 20-21, 71, 78.) At the same time, they seek to escape the logic of *Waste Conversion* and its application to the particular circumstances of this case by arguing that Public Storage did not have the sort of "control over [Shurgard, Inc.'s] business decisions in the way that a parent corporation has control over the affairs of a wholly-owned subsidiary." (Resp. at 10.) What Plaintiffs fail to recognize is that the *Waste Conversion* privilege does not require complete control of a subsidiary's actions.

As stated by the Tennessee Supreme Court: "The reason for acknowledging the privilege of a parent corporation to interfere in its wholly-owned subsidiary's contractual

2
Case 3:06-cv-00736   Document 29   Filed 11/07/06   Page 2 of 17 PageID #: 463

relations is *the usual identity of interests* between the subsidiary and its parent." 33 S.W.3d at 781 (emphasis supplied). The same type of reasoning explains the holding in *Nelson v. Metric Realty*, 2002 Tenn. App. LEXIS 698 (Tenn. Ct. App. Sept. 26, 2002) (copy attached), that there could be no inducement to breach a contract claim where the various defendants were all "direct or indirect partners" of the party that breached a settlement contract. *Id.* at *49-50. Other jurisdictions have adopted similar reasoning and extended it to situations involving mere contractual relationships. *See, e.g., Britt/Paulk Ins. Agency, Inc. v. Vandroff Ins. Agency, Inc.*, 952 F. Supp. 1575, 1584 (N.D. Ga. 1996) (holding that there can be no interference under Georgia law when "the allegedly injured relations are inextricably a part of or dependent upon the defendant's contractual or business relations," "the defendant would benefit economically from the alleged injured relations," or "both the defendant and the plaintiff are parties to a comprehensive interwoven set of contracts or relations").

It is true that *Waste Conversion* only applied the privilege to the actions of a parent with respect to its wholly owned subsidiary. But, given the stated reason behind the privilege, it should extend to the situation alleged by the Plaintiffs in this case – where one corporation allegedly exercises *de facto* control over the actions of another in anticipation of an imminent merger, particularly where the corporations have already entered in to a merger agreement that is consummated in the midst of the time period covered by the complaint.[1] (*See* Am. Compl. ¶¶ 15-16, 19-21.) This particular situation presents the "identity of interests" envisioned by the *Waste Conversion* privilege, and Plaintiffs neither provide a logical distinction nor cite any authority to the contrary.

---

[1] The Tennessee Supreme Court recently heard arguments in *Cambio Health Solutions, LLC v. Reardon*, Docket No. M2006-00007-SC-R23-CQ, a certification from the Court of Appeals for the Sixth Circuit, on the issue of whether the privilege could apply to a subsidiary that was not wholly-owned.

Plaintiffs also argue that the actions of Public Storage fall within the exceptions to the privilege announced in *Waste Conversion*, to wit: (1) "A parent corporation acting contrary to its wholly-owned subsidiary's economic interests can be considered a third party to its subsidiary's contractual relationship and can be held liable for tortiously interfering with that relationship," 33 S.W.3d at 783; and (2) "the loss of the parent corporation's privilege can be caused by its use of wrongful means." *Id.* at 783-84.

Attempting to invoke the first exception, the Amended Complaint alleges that Shurgard, Inc. gave Public Storage "*de facto* control" of the joint ventures, "despite the fact that doing so was contrary to the economic interests of [Shurgard, Inc.]" in four ways: by "reducing the profitability" of the joint ventures, by "exposing [Shurgard, Inc.] to liability for breaching the joint venture agreements," by "creating grounds to remove [Shurgard, Inc.] as managing venturer" of the joint ventures, and by "causing a dissociation of [Shurgard, Inc.] as a partner" of the joint ventures. (Am. Compl. ¶ 21.) These allegations are insufficient as a matter of law.

First, with the exception of the first category (reducing profitability), Plaintiffs' arguments are entirely circular, asserting, in effect, "We have a right to sue you for conspiracy and interference with contractual relations because your conduct gives rise to claims against you for conspiracy and interference with contractual relations." This sort of circular logic would make a nullity of the *Waste Conversion* privilege. Second, with respect to the first category (reduction of profitability), this claim must be read as raising nothing more than a theoretical possibility, rather than claiming that profitability has in fact suffered, since according to the Plaintiffs, Public Storage was hired as property manager for each of the ventures on July 14, 2006, and this lawsuit was filed only two weeks later.

4

Plaintiffs also argue that the Amended Complaint raises fact issues which, if proved, place this case within the second exception to the privilege, alleging that Public Storage employed "wrongful means" to direct the actions of Shurgard, Inc. (Resp. at 11). Specifically, Plaintiffs contend that Public Storage forced Shurgard to act through the use of "intimidation…or any other wrongful act recognized by statute or by common law." (*Id.*, quoting *Waste Conversion*, 33 S.W.3d at 784.) The only way Plaintiffs allege that Public Storage "intimidated" Shurgard, Inc., however, was through the "leverage" it obtained as a result of Shurgard, Inc.'s desire to consummate the merger. Allegations that one party to a pending merger acted in accordance with the preferences of the soon-to-be parent in anticipation of their negotiated merger does not set forth the kind of intimidation or wrongful conduct forbidden by *Waste Conversion*. Conduct that is completely appropriate on August 22, 2006 (the closing of the merger) is not wrongful merely because it occurs several weeks before the anticipated closing.

> **B.** **Even without extension of the *Waste Conversion* doctrine, Plaintiffs still fail to allege the required elements of the respective claims.**

Plaintiffs argue that Public Storage acted wrongfully by directing Shurgard to (1) terminate Freegard as the managing venturer of the joint ventures; (2) terminate the Affiliation Agreement, thereby terminating FMC as the property manager; (3) terminate negotiations to buy out the Freeman interests; and (4) execute new management services agreements with Public Storage. (*See* Resp. at 16-17; *see also* Am. Compl. ¶¶ 65-81.) They acknowledge that Shurgard had the right to terminate Freegard as managing venturer, but not "under the circumstances of this case" (Resp. at 13),[2] and they claim that Shurgard's unqualified right to terminate FMC as

---

[2] This position is inconsistent with the provisions of the joint venture agreements. (*See* Memo. in Supp. of Mot. to Dismiss at 6-7 (D.E. 15); *see also* the specimen joint venture agreement attached as Exhibit A hereto.)

the property manager is not fatal to its claims of inducement, interference and conspiracy because of the holding of *Forrester v. Stockstill*, 869 S.W.2d 328 (Tenn. 1994) (Resp. at 12, 16).

### 1. Inducement to breach

Plaintiffs' assertions notwithstanding, *Forrester v. Stockstill* is fatal to inducement claims where there is "no contractual right to continued employment."[3] 869 S.W.2d at 330. Thus, Plaintiffs should not be able to maintain any inducement claim with respect to the first three categories listed above because Plaintiffs cannot identify any contractual right to continue as managing venturer or property manager or to consummate any buy-out negotiations.

Additionally, Plaintiffs fail to allege the third element of this tort with respect to each of the inducement claims, since they have not alleged an "intent to cause the result, *i.e.,* the breach."[4] *JIT Concepts v. Shelby County Healthcare Corp.*, 358 F. Supp.2d 678, 686 (W.D. Tenn. 2005) (internal citations and quotation marks omitted); *see also Haren Constr. Co. v. Metro Gov't of Nashville*, 2003 Tenn. App. LEXIS 479, at *17 (Tenn. Ct. App., July 9, 2003) (holding that inducement to breach does not sound in negligence because it "require[s] a showing of intent") (copy attached); *Int'l Mktg. Group, Inc. v. Speegle*, 2000 Tenn. App. LEXIS 229, at *19 (Tenn. Ct. App., Mar. 30, 2000) ("The penalty of the statute is harsh and should not be enforced except upon a clear showing of a deliberate and malicious intent to procure and induce a breach of contract.") (copy attached).

---

[3] *Forrester* expressly held that the claim for inducement to breach had to fail because an at-will employee has "no contractual right to continued employment." 33 S.W.2d at 330. To the extent Plaintiffs would argue that the tort of "interference with at-will employment" should apply to interference claims such as the ones asserted in this case, where there is no contractual right to a continued relationship between two business entities, Defendants submit that such claims are now governed under the tort of intentional interference with business relationships subsequently adopted by the Tennessee Supreme Court in *Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691 (Tenn. 2002). *See Trau-Med*, 71 S.W.3d at 669 n.1, 701 (adopting the tort of intentional interference with business relationships to cover interference with respect to both existing and prospective business relationships).

[4] Defendants' first Memorandum in Support of Motion to Dismiss asserted that Plaintiffs failed to allege the malice required by this tort. Defendants concede that the Amended Complaint adequately pleads malice for purposes of Fed. R. Civ. P. 9(b).

### 2. Intentional interference with business relationships

Plaintiffs argue that they have alleged the "improper motive or improper means" necessary to sustain a claim of interference with business relationships. *Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 701 (Tenn. 2002). Specifically, Plaintiffs assert "Public Storage used the leverage it obtained over [Shurgard, Inc.] through execution of the merger agreement to coerce [Shurgard, Inc.] into breaching contracts that [Shurgard, Inc.] never would have breached but for the intimidation and economic duress placed on it by Public Storage." (Resp. at 15, citing Am. Compl. ¶¶ 18-21.) Moreover, Plaintiffs argue "Public Storage was motivated to injure the Plaintiffs in their business solely to obtain a negotiating advantage over Plaintiffs." (Resp. at 15.) These assertions do not allege the type of improper motive or improper means contemplated by the Tennessee Supreme Court when it adopted this tort.

The *Trau-Med* court listed the following types of conduct that could be considered as improper means:

> those means that are illegal or independently tortious, such as violations of statutes, regulations, or recognized common-law rules; violence, threats or intimidation, bribery, unfounded litigation, fraud, misrepresentation or deceit, defamation, duress, undue influence, misuse of inside or confidential information, or breach of a fiduciary relationship; and those methods that violate an established standard of a trade or profession, or otherwise involve unethical conduct, such as sharp dealing, overreaching, or unfair competition

71 S.W.3d at 701 n.5 (internal citations omitted). The Court also stated the minimum that was required to satisfy the requirement of an "improper motive": "with regard to improper motive, we require that the plaintiff demonstrate that the defendant's *predominant purpose was to injure the plaintiff*." *Id.* (emphasis added).

The Tennessee Court of Appeals has further clarified that not every sort of competitive behavior, even unethical behavior, is sufficiently "improper" to satisfy the requirements of this tort.

> As the *Trau-Med* court implicitly recognized, however, not every tortious, unethical, or unfair act constitutes the tort of intentional interference with prospective business relationships. Rather, the *Trau-Med* court emphasized that the plaintiff must demonstrate that the "predominant purpose" of the defendant's improper motive or act was to injure the plaintiff.

*Terra Aqua Gabions, Inc. v. Midwest Constr. Prods. Corp.*, 2006 Tenn. App. LEXIS 505, at *8 (Tenn. Ct. App., July 28, 2006) (copy attached). Therefore, the court is required to "draw the sometimes fine line between competition, albeit allegedly unfair, and tortious interference with a prospective business relationship." *Id.* at *9.

Plaintiffs' argument that Public Storage was able to use the "leverage" it obtained by virtue of the merger agreement to "coerce" any action by Shurgard misses the mark. The parties' mutual desire to consummate the merger does not render Public Storage's actions tortious. Plaintiffs' allegations do not amount to "violence, threats or intimidation, bribery, . . . duress, undue influence," or any other type of conduct that could be classified as "improper means." Nor should an alleged motivation to "injure the Plaintiffs in their business solely to obtain a negotiating advantage over Plaintiffs" be sufficient to cross the line between permitted competitive behavior and conduct that is the equivalent of violence or bribery. (Resp. at 15.) [5] Even assuming that Public Storage intended to obtain a negotiating advantage, which Defendants deny, the effort to gain a competitive advantage – a goal that is not placed off limits by *Trau-*

---

[5] This is particularly true with respect to the claims by FMC, whose only injury was the automatic termination of the management services agreements when the Affiliation Agreement was terminated pursuant to Amendment 4 to that Agreement. If a party to a terminable contractual relationship can levy a claim for interference with prospective contractual relationship based on these allegations, then no competitor can ever supplant another with an offer of better performance or lower price. This is precisely what the *Trau-Med* court sought to avoid when it incorporated the requirements of improper motive or improper means.

*Med* – would be their predominant motive, not the supposed intent to injure. *See Trau-Med*, 71 S.W.3d at 699 (stating that the Tennessee Supreme Court refused to adopt any conception of the tort that did not require improper conduct lest a claim "could be actionable merely upon proof that a defendant's intentional acts resulted in a plaintiff's economic injury . . . without any consideration of the propriety of the defendant's objective or motive"). Plaintiffs have not alleged the requisite improper means and motive and, therefore, this claim must fail.

### 3. Civil conspiracy

Plaintiffs argue that Public Storage's alleged procurement of Shurgard, Inc.'s breach of its fiduciary duty satisfies the requirement that they allege a "wrongful means" to accomplish the conspiracy, citing footnote 5 of the *Trau-Med* decision. (Resp. at 18-19.) Accepting for the purpose of argument that the Supreme Court's delineation of improper means for the purpose of providing guidance on interference claims has a logical application to a conspiracy claim does not end the inquiry. Plaintiffs have not alleged that Public Storage violated *its* fiduciary duty to the Plaintiffs. The *Trau-Med* footnote described the means used by the interfering party (here, allegedly Public Storage), not the by-product of its interference.

Furthermore, even if the Amended Complaint does sufficiently allege an improper means or improper purpose, it does not allege the requisite intent to sustain this claim. *See Trau-Med*, 71 S.W.3d at 703 (stating that civil conspiracy requires "a combination of two or more persons who, *each having the intent and knowledge of the other's intent*, accomplish by concert an unlawful purpose, or accomplish a lawful purpose by unlawful means, which results in damage to the plaintiff") (emphasis supplied). As discussed above, Plaintiffs do not allege that Public Storage intended to cause a breach of the various agreements. Nor do Plaintiffs allege that

Public Storage intended to cause Shurgard, Inc. to violate its fiduciary duties. Absent such an allegation, like the claims for inducement to breach, this claim must also fail.

## II. ALL CLAIMS BY FMC SHOULD STILL BE DISMISSED.

Despite Plaintiffs assertions to the contrary, FMC has no cognizable rights, contractual or otherwise, that were violated. Moreover, FMC lacks standing to make its request for declaratory relief in Count I.

### A. FMC's rights under the contracts were not violated.

Plaintiffs admit that FMC had no contractual rights that were violated. (*See* Resp. at 19 ("FMC is not asserting any claims in Count VI based on a breach of contract by [Shurgard, Inc.] or the Joint Ventures with FMC.").) Rather, Plaintiffs contend that FMC is entitled to relief for interference with the at-will management services agreements and the prospective termination agreement. Even accepting this postulate, Plaintiffs have still failed to allege any right that FMC possessed that was violated. Shurgard, Inc. had the right to terminate the management services agreements.

Furthermore, FMC had no rights with respect to the proposed termination agreement. The most that can be gleaned from the Amended Complaint with respect to that agreement is that "negotiations had progressed to an advanced stage." (Am. Compl. ¶ 14.) Plaintiffs make no allegation that FMC was entitled to consummation of the proposed agreement. Rather, Plaintiffs assert that there had been negotiations, that Shurgard, Inc. entered into a merger agreement with Public Storage before reaching a final agreement, that the negotiations then ceased while Shurgard, Inc. let Public Storage consider its position with respect to the transactions, and that "no final, binding agreement" was ever reached. (Am. Compl. ¶¶ 13-17.) Under the facts

10
Case 3:06-cv-00736   Document 29   Filed 11/07/06   Page 10 of 17 PageID #: 471

alleged by Plaintiffs, FMC had no rights that were violated. Therefore, all claims asserted by FMC should be dismissed.

**B.     FMC lacks standing to request declaratory relief in Count I.**

Plaintiffs assert that FMC does have standing to seek a declaration that Shurgard should be removed as the managing venturer of the joint ventures simply because FMC is a partner in the Freegard Partnerships. As support for this assertion, Plaintiffs cite Tennessee law to the effect that a partner may bind a partnership, may be liable for the debts of a partnership, and that actions "may be brought against the partnership and any or all of the partners." (Resp. at 20, citing Tenn. Code Ann. §§ 61-1-305 to -307.) Interestingly, however, the statute Plaintiffs cite only permits actions to be "brought *against*" the partners. It does not permit actions to be brought *by* the partners, in their own name, to enforce rights belonging to the partnership. In fact, the statute states only that "A *partnership* may sue and be sued *in the name of the partnership*." § 61-1-307(a) (emphasis added). This is because a partnership is a separate legal entity and, although liability may lie for the partnership's debts against the individual partners, the individual partners are not legally equivalent to the partnership.

Despite its status as a partner in the Freegard Partnerships, FMC has no privity of contract with respect to the joint venture agreements. Only the partnership enjoys that privity, and only the partnership can bring suit to enforce its rights under the agreements. It is immaterial which partner actually executed the documents on behalf of the partnership – the fact remains that they were executed on behalf of the partnership, not FMC. *See Scott v. Louisville & N. R. Co.*, 98 S.W.2d 90, 91-92 (Tenn. 1936) ("Unless otherwise agreed, a person making or purporting to make a contract with another as agent for a disclosed principal does not become a party to the contract. . . . The general rule is that one who contracts as agent cannot maintain an

action in his own name and right upon the contract.") (internal citation and quotation marks omitted).

## III. PLAINTIFFS' ADDED DISSOCIATION CLAIMS SHOULD BE DISMISSED.

Count I of the Complaint was amended to assert that Shurgard, Inc. wrongfully dissociated from the joint ventures and that "Plaintiffs are entitled to a declaration that [Shurgard, LLC] is not a partner" of the joint ventures. (Am. Compl. ¶ 51.) Count II of the Complaint was likewise amended to seek an injunction against Shurgard, LLC "from holding itself out as a partner" of the joint ventures and "from seeking to exercise any powers of a partner" under the joint venture agreements. (Am. Compl. ¶ 54.) These claims should be dismissed because the allegations in the Amended Complaint do not constitute grounds for dissociation.

Plaintiffs premise their allegations of wrongful dissociation on the prohibition contained in the various joint venture agreements against a "transfer" of interest without the written consent of the other joint venturer.[6] (*See* Am. Compl. ¶ 44-46.) "Transfer of interest" is not a defined term although the joint venture agreements describe the term to include "sell[ing], assign[ing], transfer[ring], mortag[ing], charg[ing] or otherwise encumber[ing] . . . any part or all of [a joint venturer's] Joint Venture interest." (Shurgard-Freeman Medical Center Joint Venture Agreement § 6.1(a), attached as Exhibit A; *see also* Am. Compl. ¶ 44.) Although the Plaintiffs explicitly invoke the prohibition against a transfer of interest, they are careful not to allege that Shurgard, Inc. transferred its interest in the joint ventures; instead they allege that Shurgard, Inc.'s interest "vested" in Shurgard, LLC as a result of the merger. (*See* Am. Compl. ¶ 43 ("As a

---

[6] The various joint venture agreements contain slight variations in their respective provisions governing transfers of interest, but these variations are largely immaterial to the present action. The provisions governing transfers of interest in the Operating Agreement of Memphis Properties, LLC, however, are significantly different. For purposes of this motion only, Defendants will assume that a transfer of interest that would violate the joint venture agreements would also violate the LLC Operating Agreement.

result of [the consummated merger], [Shurgard, Inc.] ceased to exist and all of its assets, including the partnership . . . interests of [Shurgard, Inc.] in the Joint Ventures were *vested* in [Shurgard, LLC].") (emphasis added).)

The distinction between "vesting" and selling, assigning, transferring, mortgaging, etc., is significant in the context of mergers and acquisitions. Although a corporation may be a partner in a partnership, corporations are still subject to rules that do not apply to natural persons. For example, the composition of the managers and governing body of a corporation may change without any effect on the corporation's status as a partner. *Cf. Deaderick v. Bank*, 45 S.W. 786, 788 (Tenn. 1897) ("A corporation is a distinct entity. Its affairs are necessarily managed by officers and agents, it is true, but in law it is as distinct a being as an individual is, and is entitled to hold property as absolutely as an individual can hold it.") (internal citation and quotation marks omitted). Similarly, the owners of a corporation may freely assign their interests in the corporation without affecting the corporation's status as a partner. *Cf. Schlater v. Haynie*, 833 S.W.2d 919, 924 (Tenn. Ct. App. 1991) ("A corporation is a person separate and apart from the persons who own the stock . . . .") (internal citation omitted).

If Public Storage had bought every outstanding share of Shurgard, Inc., the Freegard Partnerships could not claim dissociation even though Shurgard, Inc. were now wholly owned by Public Storage. Even if Public Storage had then changed the personnel on the board of directors, and then replaced the management personnel of Shurgard, Inc., the Freegard Partnerships could claim dissociation by virtue of the sum of these acts. Thus, if the merger of Shurgard, Inc.— which accomplished exactly the same result—is to be treated as a prohibited transfer of interest, it can only be because the particular mechanism of a merger itself worked the transfer.

There is currently disagreement among the states as to whether a merger operates a transfer of interest or not, although many of the cases turn on the type of interest at issue. *Compare TXO Prod. Co. v. M.D. Mark, Inc.*, 999 S.W.2d 137, 142 (Tex. App. 1999) ("Under the merger statutes it is clear that all of TXO's interests vested in Marathon immediately upon the merger. Further, under these provisions there is no transfer of the rights of the merging corporation; rather, the rights vest automatically and without further action. Accordingly, a requirement that the surviving corporation pay a fee in the event of a merger unnecessarily hinders the free flow of those rights to the surviving corporation.") *with PPG Indus., Inc. v. Guardian Indus. Corp.*, 597 F.2d 1090, 1096 (6th Cir. 1979) (relying on Ohio statutes and Delaware law, and the merger agreement, to hold that the merger effected a prohibited transfer of patent licenses).[7]

Unlike *PPG Indus.*, this case is not governed by the Delaware corporate statutory scheme. The joint venture agreements clearly state that they are governed by Tennessee law, *see* § 11.4(d) of the joint venture agreements (specimen attached as Exhibit A), and the merger agreement between Public Storage and Shurgard, Inc. states that the merger should be effected in accordance with the Washington Business Corporation Act, *see* Merger Agreement § 11.10. Under Tennessee law, "[a]ll property owned by each corporation or limited partnership that is a party to the merger *shall be vested* in the surviving corporation or limited partnership *without reversion or impairment*."[8] Tenn. Code Ann. § 48-21-108(a)(2) (emphasis added); *see also L&L Trucking*, 1992 Tenn. App. LEXIS 338, at *9 ("The official comment to section 11.06(a)(2) [of

---

[7] The Tennessee courts have not directly addressed this question, although an unreported Court of Appeals opinion does cite *PPG Indus.* with approval in determining the effect of a merger on a statutory creation--a Certificate of Convenience and Necessity. In *L&L Trucking, Inc. v. Hewlett*, 1992 Tenn. App. LEXIS 338 (Tenn. Ct. App., Apr. 8, 1992) (copy attached), the court held that a merger operated as a transfer of such a certificate, which requires approval by the Public Service Commission under Tenn. Code Ann. § 65-5-107(d). *Id.* at *8.

[8] At the time of the *L&L Trucking* decision, this statute was codified at § 48-21-106; but it was transferred to § 48-21-108 in 1995. There have also been some slight amendments to the language of the statute, none of which are meaningful to this analysis.

the Model Business Corporation Act, which Tennessee adopted] provides that this is not a conveyance or transfer giving rise to 'claims of reverter or impairment of title based on a prohibited conveyance or transfer.'") (quoting official comment to the Revised Model Business Corporation Act, §11.06 (1984)). Clearly the intent of the Tennessee legislature is that property owned by a corporation is to "vest . . . without . . . impairment" when the corporation merges with another corporation.

Like Tennessee, Washington also adopted the language of the Model Business Corporation Act. Section 23B.11.060 of the Washington Business Corporation Act provides that "[w]hen a merger takes effect: . . . (b) The title to all real estate and other property owned by each corporation party to the merger *is vested* in the surviving corporation *without reversion or impairment*."[9] Wash. Rev. Code § 23B.11.060(1) (emphasis added). Therefore, under either statute, the property of Shurgard, Inc. vested in Shurgard, LLC at the time of merger "without . . . impairment." No other action by Shurgard, Inc. was required. Up until the exact moment that it ceased to exist, Shurgard, Inc. maintained complete ownership of its property. But in that exact moment (1) Shurgard, Inc.'s "separate existence . . . ceased," (2) its property "vested in" Shurgard, LLC "without . . . impairment," and (3) all of Shurgard, Inc.'s "liabilities . . . vested in" Shurgard, LLC. Tenn. Code Ann. § 48-21-108(a). Defendants submit that this should not constitute a prohibited transfer of interest in this context. To hold otherwise would place an inordinate restriction on companies who seek to further their financial interests in a manner expressly sanctioned by the applicable corporate code.

Because Plaintiffs have not and cannot allege any transfer of Shurgard, Inc.'s interest in the joint venture agreements, their claims of wrongful dissociation should be dismissed.

---

[9] Tennessee Code Ann. § 48-21-106 contained this language at the time of the *L&L Trucking* decision.

## CONCLUSION

Plaintiffs have failed to allege facts sufficient to sustain Counts V, VI, and VII because Defendants should be treated as a single entity during all times relevant to the Complaint and because Plaintiffs have not pleaded facts that would establish critical elements of these claims. All claims asserted by FMC should be dismissed because Plaintiffs fail to allege that FMC had any cognizable rights that were violated and, with respect to Count I, FMC lacks standing to assert the relief requested. Finally, the court should dismiss Plaintiffs dissociation claims premised on the alleged transfer of interest because a merger cannot work a transfer of interest.

Respectfully submitted,

**NEAL & HARWELL, PLC**

By:   /s/ Thomas H. Dundon
     Thomas H. Dundon, No. 004539
2000 One Nashville Place
150 Fourth Avenue, North
Nashville, TN 37219-2498
(615) 244-1713
***Attorney for Defendant Shurgard Storage Centers, LLC and Public Storage, Inc.***

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served upon the following counsel of record via the Court's electronic filing system, this the 7th day of November, 2006:

Jeffrey A. Greene
Jeffrey A. Greene, P.C.
One Burton Hills
Suite 330
Nashville, TN 37215

*Attorney for Plaintiffs Freeman Management Corporation, et al.*

                                          /s/ Thomas H. Dundon