IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| FREEMAN MANAGEMENT CORPORATION, a Tennessee corporation, and FREEGARD PARTNERS I, FREEGARD PARTNERS III, FREEGARD PARTNERS IV, FREEGARD PARTNERS V, FREEGARD PARTNERS VI, and FREEGARD PARTNERS VIII, each a Tennessee general partnership, <br><br>　　　Plaintiffs, <br><br>v. <br><br>SHURGARD STORAGE CENTERS, LLC, and PUBLIC STORAGE, INC., <br><br>　　　Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) Case No. 3:06cv0736 ) ) ) ) ) |

## MEMORANDUM OPINION

Plaintiffs Freeman Management Corporation ("FMC") and Freegard Partners I, III, IV, V, VI and VIII (collectively, the "Freegard Partnerships") (with FMC, "Plaintiffs") have filed suit against Defendants Shurgard Storage Centers, LLC ("Shurgard")[1] and Public Storage, Inc. ("Public Storage") (together, "Defendants") seeking declaratory and injunctive relief as well as compensatory and punitive damages against Shurgard for breach of contract and breach of fiduciary duty, and against Public Storage for inducement of breach of contract and tortious interference with business relations. Plaintiffs also assert a claim for civil conspiracy against both Defendants.

Defendants now seek dismissal of certain counts in Plaintiffs' complaint, including all claims asserted by Plaintiff FMC specifically (Counts I, VI and VII), and Counts V and VII in their entirety, as asserted by any of the Plaintiffs. (Doc. No. 14.) Plaintiffs filed a response in opposition to the defendants' motion (Doc. No. 22), and at the same time sought permission to file an amended complaint to address some of the contentions

---

[1]The entity known as Shurgard Storage Centers, Inc., named as a defendant in the original complaint, ceased to exist as an independent entity as of August 22, 2006, when it merged into a newly formed entity named Shurgard Storage Centers, LLC, a Delaware limited liability company and a subsidiary of defendant Public Storage. Shurgard Storage Centers, LLC is apparently the appropriate defendant. Hereinafter, to the extent a distinction between Shurgard Storage Centers, Inc. and Shurgard Storage Centers, LLC is required, the former will be referenced as "Old Shurgard" and the latter as "New Shurgard." Otherwise, the term "Shurgard" applies to both entities.

made by the Defendants' motion.  The Court granted Plaintiffs' motion to amend after Defendants indicated they did not oppose it, and Defendants have now, with the Court's permission, filed a Reply brief (**Doc. No. 29)** to address the arguments made in Plaintiffs' response that rely upon the allegations set forth in the Amended Complaint.  Consequently, the Court has construed the motion to dismiss in light of the allegations in the First Amended Complaint.

For the reasons discussed below, the Court will grant in part and deny in part Defendants' motion.  Specifically, the Court will deny the motion to dismiss Count V of the First Amended Complaint insofar as it states a claim by the Freegard Partnerships against Public Storage for inducement of breach of contract.  In all other respects, Defendants' motion is well taken:  The claim for tortious interference with business relations contained in Count V will be dismissed; Counts VI and VII will be dismissed in their entirety; and the claims asserted by Plaintiff FMC in Count I will likewise be dismissed.

I. **STANDARD OF REVIEW**

Under Rule 12 of the Federal Rules of Civil Procedure, a defendant may seek dismissal of the complaint, or certain causes of action set forth therein, based upon the plaintiff's "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  When considering a Rule 12(b)(6) motion to dismiss, a court must treat all of the well pleaded allegations of the complaint as true and construe all of the allegations in the light most favorable to the plaintiff.  *Benzon v. Morgan Stanley Distribs., Inc.*, 420 F.3d 598, 605 (6th Cir. 2005).  "Dismissal of the complaint is proper 'only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.' "  *Trzebuckowski v. City of Cleveland*, 319 F.3d 853, 855 (6th Cir. 2003) (quoting *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984)).  The Court is not required, however, to "accept as true legal conclusions or unwarranted factual inferences."  *Bovee v. Coopers & Lybrand, C.P.A.*, 272 F.3d 356, 361 (6th Cir. 2001) (internal quotation marks and citation omitted).  In addition, Rule 12(b)(6) must be read in conjunction with Rule 8(a), which provides that a pleading for relief shall contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a); 5A Wright & Miller, Federal Practice and Procedure § 1356 (1990).  The moving party is entitled to relief only when the complaint fails to meet this very liberal standard.

"In determining whether to grant a Rule 12(b)(6) motion, the court primarily considers the

allegations in the complaint, although matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint also may be taken into account." *Nieman v. NLO, Inc.*, 108 F.3d 1546, 1554 (6th Cir. 1997) (citation omitted); *see also* Fed. R. Civ. P. 10 ("A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes."). In addition, however, the Court may consider documents introduced by the defendant, even if they were not attached to the initial complaint, so long as they were referenced in the complaint and are central to the plaintiff's claim. *Weiner v. Klais & Co.*, 108 F.3d 86, 89 (6th Cir. 1997). "Otherwise, a plaintiff with a legally deficient claim could survive a motion to dismiss simply by failing to attach a dispositive document upon which it relied." *Id.* (citation omitted). Consequently, the Court may consider the contracts referenced and relied upon in the First Amended Complaint and submitted by the Defendants in support of their motion, without converting the motion into one for summary judgment under Rule 56.

## II.  FACTUAL BACKGROUND

The facts set forth herein are taken directly from the First Amended Complaint, with reference to the written agreements relied upon by the Plaintiffs' complaint and submitted by Defendants with their motion, unless otherwise indicated.

Plaintiffs are all Tennessee-based entities involved in the development and operation of self-storage facilities.[2] Shurgard Storage Centers, Inc. was a Washington corporation qualified to do business in Tennessee, likewise engaged in the development and operation of self-storage facilities as a national chain identified by the trade-name "Shurgard." As indicated in note 1, *supra*, Old Shurgard merged into Shurgard Storage Centers, LLC, a subsidiary of defendant Public Storage, on August 22, 2006. Public Storage is a California corporation apparently also engaged in the business of developing and operating self-storage facilities.

Beginning in 1993, the Freegard Partnerships entered into a series of contracts with Shurgard for the purpose of operating the existing Freegard facilities under the Shurgard name and developing new self-storage facilities in Tennessee and Kentucky as joint ventures with Shurgard (the "Joint Ventures"). The

---

[2]All of the partners of the Freegard Partnerships are individuals who are residents of Tennessee or, in one case, a resident of Florida.

contracts executed by the parties included (1) an Affiliation and Development Agreement ("Affiliation Agreement") by and between Shurgard and FMC, which provided a framework for the creation of separate joint ventures that would each develop and/or own one or more self-storage facilities; (2) seven separate joint venture agreements by and between Shurgard and each one of the Freegard Partnerships ("Joint Venture Agreements"); and (3) a separate management services agreement between each Joint Venture and FMC pursuant to which FMC provided managements services to the Joint Ventures for a fee. Under this arrangement, which worked successfully for more than ten years, one of the Freegard Partnerships served as the managing partner for each one of the Joint Ventures, and each facility owned by the Joint Ventures was managed by FMC.

In 2005, Shurgard and the Plaintiffs began discussing the possibility of transferring the management of the facilities owned by the Joint Ventures from Plaintiffs to Shurgard. These conversations led to negotiations regarding Shurgard's potential purchase of the Freegard Partnerships' interests in the Joint Ventures. By early 2006, although no binding contract had been executed, "negotiations had progressed to an advanced stage." (1st Am. Compl. ¶ 14.) The contemplated terms of the transaction included "substantial benefits to the Freegard Partnerships as well as FMC" in return for the Plaintiffs' sale of their interest in the Joint Ventures. (*Id.*)

On March 7, 2006, however, Shurgard announced that it had entered into a merger agreement with Public Storage, pursuant to which Public Storage would acquire all of the outstanding shares of stock in Shurgard, which would then become a wholly owned subsidiary of Public Storage. After this announcement, Shurgard terminated negotiations with the Plaintiffs regarding the purchase of Plaintiffs' interests in the Joint Ventures, and no binding agreement was reached between Shurgard and Plaintiffs for the sale of Plaintiffs' interests in the Joint Ventures.

In April 2006, Public Storage requested a meeting with Plaintiffs to discuss the Joint Ventures. At that meeting the Plaintiffs expressed their desire to continue operating the Joint Ventures as they had been operated since their inception. Public Storage stated that this arrangement was unacceptable to it and suggested that the Freegard Partnerships should sell their interests in the Joint Ventures. The Freegard Partnerships sought to negotiate such a sale with Public Storage, but the terms offered by Public Storage were

not as attractive as those previously offered by Shurgard. The terms were unacceptable to Plaintiffs and no agreement was reached.

In a letter dated June 13, 2006, Shurgard gave notice to FMC that it was terminating the Affiliation Agreement effective July 15, 2006. Plaintiffs acknowledge that Shurgard's termination was in accordance with the terms of an Addendum to the Affiliation Agreement, a copy of which Defendants filed with their motion. Further, the termination of the Affiliation Agreement operated automatically to terminate the management agreements between the Joint Ventures and FMC in accordance with their terms. Termination of the Affiliation Agreement and the management agreements did not operate to terminate the Joint Ventures themselves or remove the Freegard Partnerships from their positions as managing venturers of their respective Joint Ventures. However, by separate letters also dated June 13, 2006, Shurgard gave notice that it was calling meetings of the members or partners of each of the Joint Ventures, for the purpose of seeking approval of two actions: (1) the removal of the Freegard Partnerships as managing venturers of each Joint Venture and the appointment of Shurgard as managing venturer; and (2) appointing Public Storage to replace FMC as the management company for the facilities owned by the Joint Ventures.

The meetings called by Shurgard were held on June 21, 2006 and were attended by representatives of Public Storage as well as from Shurgard and each of the Plaintiffs. At the meetings, Shurgard voted in favor of its two proposals and the Freegard Partnerships voted against them. Because the Joint Venture Agreements required unanimous consent in order for the proposals to be approved, neither proposal was approved at the meetings. Shurgard, however, subsequently invoked a "deadlock" provision contained within the Joint Venture Agreements, which permitted Shurgard to become the managing venturer of each Joint Venture without unanimous approval of the Freegard Partnerships. After having thus made itself the managing venturer of each Joint Venture, Shurgard caused the Joint Ventures to enter into management agreements with Public Storage to manage the facilities owned by the Joint Ventures, to go into effect upon the expiration of the FMC management agreements.

According to the Plaintiffs, Shurgard's actions in making itself the managing venturer of each Joint Venture and entering into management agreements with Public Storage after termination of the management agreements with FMC constituted fraud, malfeasance, bad faith, gross negligence or default of the

agreements, which gave the Freegard Partnerships "cause" under the Joint Venture Agreements to terminate Shurgard as managing venturer. Consequently, by letter dated July 25, 2006, the Freegard Partnerships gave notice to Shurgard of its termination for cause as managing venturer of each of the Joint Ventures. By letter dated July 27, 2006, Shurgard responded that it did not believe its actions constituted default under the Joint Venture Agreements or provided cause for the Freegard Partnerships to remove it as managing venturer or to terminate the management agreements with Public Storage. Shurgard therefore refused to step aside as managing venturer.

Plaintiffs contend that, after the execution of the merger agreement but prior to the closure of the merger, "Public Storage exercised *de facto* control over the affairs of Shurgard, at least insofar as the [Joint Ventures] are concerned." (1st Am. Compl. ¶ 19.) Further, Plaintiffs allege as follows:

> The pendency of the merger gave Public Storage leverage over Old Shurgard because of the threat that if Old [Shurgard] did not comply with the instructions of Public Storage, then the merger would not occur. But for the merger agreement and the leverage that it provided to Public Storage, Old Shurgard would never have given *de facto* control over its affairs regarding the [Joint Ventures] to Public Storage, one of its chief competitors, nor engaged in the conduct described in this complaint. . . .
>
> Old Shurgard agreed to follow the instructions of Public Storage and give Public Storage such *de facto* control with respect to the [Joint Ventures] despite the fact that doing so was contrary to the economic interests of Old Shurgard in several ways, including (a) reducing the profitability of the [Joint Ventures] by transferring management to Public Storage; (b) exposing Old Shurgard to liability for breaching the [Joint Venture Agreements] as demanded by Public Storage; (c) creating grounds to remove Old Shurgard as managing venturer of the [Joint Ventures]; and (d) causing a dissociation of Old Shurgard as a partner of the Joint Ventures.

(*Id.* ¶ 20, 21.) In essence, Plaintiffs complain that Shurgard would not have terminated the Affiliation Agreement and management agreements and removed the Freegard Partnerships as managing venturers prior to completion of the proposed sale of the Freegard Partnerships' interests in the Joint Ventures to Shurgard, but for the instigation of Public Storage. (*See* 1st Am. Compl. ¶ 28.)

Plaintiffs further allege that, when the merger closed on August 22, 2006, Old Shurgard ceased to exist and all its assets, including Old Shurgard's interests in the Joint Venture, became vested in New Shurgard, a wholly owned subsidiary of Public Storage. (1st Am. Compl. ¶ 43.) According to Plaintiffs, this arrangement constitutes a breach of the Joint Venture Agreements, because the Agreements do not permit the sale or transfer of any joint venturer's interest to a third party without the other joint venturer's consent.

Based upon these allegations, Plaintiffs set forth seven separate "Counts" in their complaint. Under Count I, brought by FMC and the Freegard Partnerships against Shurgard and Public Storage, the Plaintiffs seek a declaration that the new management agreements executed by and between Shurgard as managing venturer and Public Storage are void or voidable; that the Freegard Partnerships gave proper notice of removal for cause of Shurgard as managing venturer; and that, because Old Shurgard wrongfully dissociated as a partner in the Joint Ventures, New Shurgard is not a partner of the Joint Ventures. In Count II, the Freegard Partnerships seek to enjoin New Shurgard from holding itself out as a partner or managing venturer of the Joint Ventures or acting in such capacity, including by making payments to Public Storage under the new management agreements. In Count III, the Freegard Partnerships seek damages against Shurgard for breach of the Joint Venture Agreements. In Count IV, the Freegard Partnerships state a claim for breach of fiduciary duty against Shurgard. Counts V and VI are brought by the Freegard Partnerships and FMC, respectively, against Public Storage for "Interference with Contract and Prospective Contract and Inducement to Breach." Finally, Count VII alleges that both Shurgard and Public Storage are liable to all Plaintiffs for civil conspiracy.

### III. DISCUSSION

Defendants' motion, as indicated above, seeks dismissal of all claims asserted by Plaintiff FMC, including those in Counts I and VI, as well as dismissal of Counts V (asserted by the Freegard Partnerships) and VII (asserted by all Plaintiffs) in their entirety. In support of their motion to dismiss these claims, Defendants assert, first, that they "should be treated as constituting a single entity at all times relevant to the Complaint," such that they cannot legally conspire with each other or interfere with each other's contracts or prospective contracts. (Doc. No. 15, at 3.) Second, Defendants claim that the First Amended Complaint fails to allege one or more critical elements of each of these counts.

As indicated above, Counts V and VI differ only insofar as V is asserted by the Freegard Partnerships and VI is asserted by FMC. Notwithstanding, Count V and Count VI each actually attempt to state two separate claims: one for inducement of breach of (or interference with) an existing contract and one for tortious interference with a prospective contract. Although Plaintiffs' complaint and Defendants' motion both fail to differentiate between claims for interference with an existing contract and claims for interference with

a prospective or at-will contract, Tennessee courts do make such a distinction, and the elements of the two claims differ in significant ways. Consequently, the Court will first embark upon a discussion of the inducement-of-breach claims brought by both Plaintiffs, including an overview of the various agreements or prospective agreements at issue here. Then follow discussions of the tortious-interference and civil-conspiracy claims. Last, the Court will address FMC's interest in the claims asserted in Count I.

### A. Inducement of Breach of Contract

#### (1) Elements of a Claim for Inducement of Breach of Contract

In Tennessee, the common-law tort of interference with contract has been codified under the name "inducement of breach of contract," s*ee* Tenn. Code Ann. § 47-50-109, but Tennessee courts have recognized that the statute embodies the same elements as the common-law tort.[3] *Quality Auto Parts Co. v. Bluff City Buick Co.*, 876 S.W.2d 818, 822 (Tenn. 1994). Both require:

(1) the existence of a legal contract between the plaintiff and a third party;

(2) the defendant's awareness of the contract;

(3) the defendant's malicious intent to induce breach of the contract;

(4) a breach of contract proximately caused by defendant's actions; and

(5) resulting damages to the plaintiff.

*See id.*; *Buddy Lee Attractions, Inc. v. William Morris Agency, Inc.*, 13 S.W.3d 343, 359 (Tenn. Ct. App. 1999).

#### (2) The Contracts and Business Relations at Issue Here

Based upon the allegations in the First Amended Complaint, it appears that the following contracts or potential contracts are it issue in this case:

(a) *Affiliation Agreement between FMC and Shurgard.* Plaintiffs clearly acknowledge that this contract was terminated in accordance with its own terms, not breached. Consequently, Public Storage's interference with that arrangement cannot give rise to a claim for inducement of breach of contract, since one

---

[3]While the elements of the common-law cause of action have been embodied in the statute, the statute also permits treble damages. It is unclear whether Plaintiffs intended to assert a claim under the common law or the statute. Although the titles of their "Counts" in the First Amended Complaint refer both to "Interference with Contract" and "Inducement to Breach", Plaintiffs do not reference the statute nor request treble damages. Instead Plaintiffs seek punitive damages under the apparently more demanding common-law standard.

of the necessary elements of such a claim, as set forth above, is actual breach of a contract. *Cf. Polk & Sullivan, Inc. v. United Cities Gas Co.*, 783 S.W.2d 538, 543 (Tenn. 1989) ("Where the contract interfered with is terminable at will[,] there is no contract right to have the relation continued.").

      (b) *Management agreements between FMC and the Joint Ventures.* Again, Plaintiffs admit that the management agreements terminated automatically with the termination of the Affiliation Agreement such that no actual breach of the management agreements occurred. Public Storage's interference with the management agreements therefore cannot give rise to a claim for inducement of breach of contract.

      (c) *Joint Venture Agreements between Freegard Partnerships and Shurgard.* In the First Amended Complaint, Plaintiffs allege that the transfer of Old Shurgard's assets to New Shurgard, a wholly owned subsidiary of Public Storage, as part of the merger, constituted a breach of the Joint Venture Agreements. In addition, Plaintiffs claim that Shurgard's invocation of the "deadlock" provision in the Joint Venture Agreements, Shurgard's positioning itself as the managing venturer and its entering into agreements with Public Storage to provide management services to the Joint Ventures were acts taken in bad faith and thus in contravention of the Joint Venture Agreements. According to Plaintiffs, Public Storage actively induced Shurgard to breach these contracts. If that allegation is true, each Freegard Partnership would have standing to state a claim for inducement of breach of the respective Joint Venture Agreement to which it is a party. Because *FMC* is not a party to any of the Joint Venture Agreements, however, it cannot state a claim for inducement of breach of those agreements.

      (d) *Potential sale of Freegard Partnerships' interests in Joint Ventures to Shurgard.* Plaintiffs allege that Public Storage tortiously interfered with the prospective sale of the Freegard Partnerships' interests in the Joint Ventures to Shurgard. Plaintiffs allege that "the terms of the proposed transaction included substantial benefits to the Freegard Partnerships as well as FMC, which was to be a party to the proposed transactions along with the Freegard Partnerships. (1st Am. Compl. ¶ 14.) Plaintiffs admit that no binding contract was executed regarding the sale, so, again, interference with the potential agreement cannot give rise to a claim for inducement of breach of contract.

      In sum, according to Plaintiffs' allegations, the only actual contracts that have been breached were the Joint Venture Agreements, to which only Shurgard and the Freegard Partnerships, not FMC, were parties.

Consequently, as a threshold matter, it is clear that FMC has not stated a claim for inducement of breach of any contract to which it was a party.

### (3) Whether the Freegard Partnerships Have Stated a Claim for Inducement of Breach of Contract

With respect to the Freegard Partnerships' inducement-of-breach claim, Defendants argue that Public Storage had a "privilege" to breach by virtue of the relationship between it and Shurgard. Second, Defendants argue that Plaintiffs failed to allege malice on the part of Public Storage as required to state a claim for inducement of breach of contract.

With respect to Defendants' privilege argument, the Tennessee Supreme Court has held that:

> [A] parent corporation is privileged to interfere in the contractual relations of a wholly-owned subsidiary and that it is immune from liability for inducing to breach a contract with another party. This privilege, however, can be lost . . . by acting contrary to such subsidiary's economic interests . . . .

*Waste Conversion Sys., Inc. v. Greenstone Indus., Inc.*, 33 S.W.3d 779, 784 (Tenn. 2000). Thus, in response to Defendants' arguments, Plaintiffs contend that (1) Shurgard did not become a subsidiary of Public Storage until the merger closed in August 2006, after the events giving rise to Plaintiffs' claims occurred, so the parent-subsidiary privilege does not apply in this case; and (2) even if Shurgard and Public Storage were in the type of relationship that might give rise to a privilege to interfere, Public Storage lost that privilege by acting contrary to Shurgard's interests.

Obviously, for purposes of Defendants Rule 12(b)(6) motion, the Court must consider the facts in the light most favorable to the Plaintiffs. In that light, even assuming the "privilege" asserted by Defendants might be applied outside the parent-subsidiary context, the Court finds that Plaintiffs have alleged facts which, if true, would require a conclusion that Public Storage and Shurgard did not have such a "complete unity of interest," *Waste Conversion*, 33 S.W.3d at 782, during the time period between execution of the merger agreement and the closing of the merger that application of the privilege would be warranted, despite Plaintiff's alternative allegations that Public Storage was exercising "de facto" control over Shurgard during the relevant time frame. For instance, Plaintiffs allege that during the pendency of the merger, Shurgard "retained its identity as a separate corporation" whose interests were not identical to those of Public Storage; the two entities remained competitors; Shurgard "attempted" to conduct its affairs in such a way as not to jeopardize the interests of its

shareholders in the event the merger did not close; and Public Storage did not have control over Shurgard's decisions to the same extent a parent corporation has control over its subsidiary's operations. (1st Am. Compl. ¶¶ 22, 23.) More importantly, even if Public Storage arguably did have a privilege to interfere with Shurgard's contracts, Plaintiffs' First Amended Complaint adequately alleges that Public Storage acted contrary to Shurgard's interests in several concrete ways when it interfered with the Joint Venture Agreements.[4] Defendants' motion to dismiss the inducement of breach claim on the grounds of a privilege to interfere is therefore unavailing.

Defendants also argue that Plaintiffs have not adequately pleaded the "malice" element of an inducement claim, in response to which Plaintiffs respond correctly that a general allegation of malice is sufficient under the federal pleading rules. *See* Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge, and other condition of mind of a person may be averred generally."). In paragraph 69, under Count V of the First Amended Complaint, Plaintiffs allege: "[T]he actions of Public Storage were motivated by malice and constituted interference with prospective contract or interference with existing contractual relationships."

Such allegations are clearly adequate to satisfy the pleading requirements here, particularly given that in the context of a claim for tortious interference with contract, "malice" is defined simply as "the willful violation of a known right." *In re AM Int'l, Inc.*, 46 B.R. 566, 575 (Bankr. M.D. Tenn. 1985) (citations omitted). Consequently, unlike the level of malice ordinarily required for punitive damages under Tennessee law, malice in the context of an inducement-of-breach claim does not require ill will or spite toward the injured party. It only requires the intentional commission of a harmful act without justifiable cause. *Id.*; *see also Prime Co. v. Wilkinson & Snowden, Inc.*, No. W2003-00696-COA-R3CV, 2004 WL 2218574, at *4 (Tenn. Ct. App. Sept. 30, 2004) (reversing summary judgment for defendant on the grounds that the trial court erred in applying the "punitive damages definition of malice" rather than the definition applicable in the inducement-of-breach context). "Interference [with an existing contract] is without justification if it is done for the indirect purpose of

---

[4] As set forth in Part II above, Plaintiffs allege that Public Storage's interference with Shurgard's contracts "was contrary to the economic interests of Old Shurgard in several ways, including (a) reducing the profitability of the [Joint Ventures] by transferring management to Public Storage; (b) exposing Old Shurgard to liability for breaching the [Joint Venture Agreements] as demanded by Public Storage; (c) creating grounds to remove Old Shurgard as managing venturer of the [Joint Ventures]; and (d) causing a dissociation of Old Shurgard as a partner of the Joint Ventures." (1st Am. Compl. ¶¶ 20, 21.)

injuring the plaintiff *or benefiting the defendant at the plaintiff's expense.*" *Crye-Leike Realtors, Inc. v. WDM, Inc.*, No. 02A01-9711-CH-00287, 1998 WL 651623, at *6 (Tenn. Ct. App. Sept. 24, 1998) (quotation marks and citation omitted; emphasis added). Plaintiffs here have certainly alleged facts that, if true, would permit a reasonable jury to conclude that Public Storage's actions in inducing Shurgard's breach of the Joint Venture Agreements were taken for the purpose of benefiting itself at the Freegard Partnerships' expense.

For these reasons, Defendants' motion to dismiss the Freegard Partnerships' claim against Public Storage for inducement of breach of contract (set forth in Count V) will be denied. However, because FMC has not stated a claim for breach of any contract to which it was a party, which is an essential element of an inducement-of-breach claim, the Court will grant Defendants' motion to dismiss FMC's inducement of breach claim (set forth in Count VI).

    **B.    Tortious Interference with Prospective Contract**

        *(1)    Elements of a Claim for Tortious Interference*

Liability for the tort of intentional interference with prospective contract or existing business relations, expressly recognized by the Tennessee Supreme Court only in 2002, may be imposed on the interfering party if the plaintiff demonstrates:

    (1)    an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons;

    (2)    the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general;

    (3)    the defendant's intent to cause the breach or termination of the business relationship;

    (4)    the defendant's improper motive or improper means; and

    (5)    damages resulting from the tortious interference.

*See Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 701 (Tenn. 2002).

The most significant difference between this tort and that of inducement of breach of contract is the type of motive or means required. As discussed above, liability for inducement of breach of contract may be imposed if the inducer's motive was simply to benefit himself, with the indirect effect of damaging the plaintiff. Consequently, business competition is no defense to a claim for inducement of breach of an existing contract. Conversely, in the tortious-interference context, business competition may be a defense, as the Tennessee

Supreme Court has long held that, in the absence of an actual contract, a competitor is privileged to attempt to advance its own business interests at the expense of a competitor's, so long as the method of such competition is not improper. *See, e.g.*, *Sullivan, Inc.*, 783 S.W.2d at 543 ("[T]he policy of the common law has always been in favor of free competition. . . . Where the contract interfered with is terminable at will . . . the privilege of competition has been recognized.") (internal quotation marks and citations omitted). Thus, to show an "improper motive" in the tortious-interference context, the *Trau-Med* court stated that the plaintiff must demonstrate that "the defendant's *predominant* purpose was to injure the plaintiff." Trau-Med, 71 S.W.3d at 701 n.5 (emphasis added).

Even if the *motive* for interference was proper, a plaintiff may recover if the *means* of interference was not. The non-exclusive list of means of interference with a prospective business relation that may be considered "improper" enumerated in *Trau-Med* includes:

> acts that are illegal or independently tortious, such as violations of statutes, regulations, or recognized common-law rules; violence, threats or intimidation, bribery, unfounded litigation, fraud, misrepresentation or deceit, defamation, duress, undue influence, misuse of inside or confidential information, or breach of a fiduciary relationship; and those methods that violate an established standard of a trade or profession, or otherwise involve unethical conduct, such as sharp dealing, overreaching, or unfair competition.

*Id.* at 701 n.5 (internal citations omitted).

### (2) Whether the Plaintiffs Have Stated a Claim for Tortious Interference

In their motion, Defendants basically argue that Plaintiffs have not alleged facts sufficient to meet the "improper means or improper motive" element of a tortious-interference claim.[5] Plaintiffs dispute that contention and point to specific paragraphs in the Amended Complaint in which they allege that (1) Public Storage's actions caused Shurgard to breach its fiduciary duties to Plaintiffs; (2) Public Storage's actions were

---

[5] Defendants apparently intend for their privilege argument, addressed above in the discussion of Plaintiffs' inducement-of-breach claim, to apply to the tortious-interference claim as well. Defendants have not, however, cited to any Tennessee case law supporting the application of the parent-subsidiary privilege in the tortious-interference context as opposed to the inducement-of-breach context. Moreover, because the "improper means or motive" element of a tortious-interference claim itself requires the same type of conduct that would be sufficient to nullify the privilege in the inducement context, the Court finds it unnecessary to consider the question of whether Tennessee courts would apply the privilege for purposes of a tortious interference claim. *See Waste Conversion Systems*, 33 S.W.3d at 784 (holding that the parent-subsidiary privilege could be lost by using "wrongful means," including "fraud, misrepresentation, threats, violence, defamation, trespass, restraint of trade, intimidation, molestation, or any other wrongful act recognized by statute or common law").

"motivated by malice"; and (3) Public Storage's actions were not in Shurgard's best interests but were taken solely for purpose of coercing the Freegard Partnerships to sell their interests in the Joint Ventures at price acceptable to Public Storage. (*See* 1st Am. Compl. ¶¶ 61, 68–71, 75–79, 83.) In addition, Plaintiffs allege that "[t]he pendency of the merger gave Public Storage leverage over Old Shurgard because of threat [sic] that if Old [Shurgard] did not comply with the instructions of Public Storage, then the merger would not occur." (1st Am. Compl. ¶ 20.)

The Court finds that the referenced allegations do not indicate improper motive or means on the part of Public Storage as required for a claim of tortious interference. First, allegations of mere "malice" are not sufficient to state a claim for tortious interference; rather, to satisfy the "improper motive" element for a tortious-interference claim, as indicated above, harm to the plaintiff must be the defendant's "predominant motivation." *Trau-Med*, 71 S.W.3d at 701 n.5. Although Plaintiffs's response to Defendants' motion includes an argument that Public Storage's predominant motivation for interfering with the business relationship between Shurgard and Plaintiffs was to injure Plaintiffs, the facts alleged in the Amended Complaint do not support that contention. Rather, the only reasonable inference to be drawn from the Amended Complaint is that Public Storage was motivated purely by its own business interests, in the pursuit of which it caused incidental harm to Plaintiffs.

Likewise, the alleged "wrongful means" to which Plaintiffs point do not amount to statutory violations, violence, bribery, fraud, misrepresentation, breach of a fiduciary relationship or any other overtly unethical conduct of the type the Tennessee Supreme Court seemed to have in mind in *Trau-Med*. The Amended Complaint includes allegations of breach of fiduciary duty, which may be an improper method, but the alleged breach of fiduciary duty was by Shurgard, not Public Storage. Plaintiffs also allege that Shurgard terminated its prospective business relations with Plaintiffs because of the "threat" that if Shurgard "did not comply with the instructions of Public Storage, then the merger would not occur." (1st Am. Compl. ¶ 20.) Although intimidation, duress or undue influence may constitute "improper means" of interference with existing business relations, the "threat" alleged in the complaint is clearly not of the type that would give rise to a claim for tortious interference. In particular, while the complaint implies a "threat" by Public Storage, it does not state that Public Storage actually voiced such a threat. More importantly, the act allegedly "threatened" (Public

Storage's abandonment of the merger with Shurgard) was not in any sense illegal. As a result, the only reasonable inference to be drawn from Plaintiffs' allegations is that Shurgard believed that it was in its best interest to terminate the business relationship with Plaintiffs in order to pursue the merger with Public Storage. Nothing in the Amended Complaint suggests that decision was made under duress or pursuant to undue influence, or that Public Storage otherwise engaged in improper methods of persuading Shurgard to abandon its relationship with Plaintiffs in favor of a relationship with Public Storage instead.

Because Plaintiffs' First Amended Complaint does not allege or even imply that Public Storage engaged in wrongful means of the type required to give rise to a tortious-interference claim or that its primary purpose for engaging in the activities that are the subject of the complaint was to harm Plaintiffs, Plaintiffs have failed to state a claim for tortious interference under Tennessee law. Defendants' motion to dismiss Plaintiffs' claims for tortious interference set forth in Counts V and VI must therefore be granted.

## C. *Civil Conspiracy*

Having concluded that the Freegard Partnerships have stated a claim against Public Storage for inducement to breach, but that neither the Freegard Plaintiffs nor FMC has stated a claim for tortious interference with business relations, the Court must now consider whether Plaintiffs have stated a claim for civil conspiracy against both Defendants in Count VII of the Amended Complaint.

The elements of a cause of action for civil conspiracy under Tennessee common law are: (1) a common design between two or more persons; (2) to accomplish by concerted action an unlawful purpose, or a lawful purpose by unlawful means; (3) an overt act in furtherance of the conspiracy; and (4) injury to person or property resulting in attendant damage. *Braswell v. Carothers*, 863 S.W.2d 722, 727 (Tenn. Ct. App. 1993), *cited in Menuskin v. Williams*, 145 F.3d 755, 770 (6th Cir. 1998). In addition, civil conspiracy requires an underlying predicate tort allegedly committed pursuant to the conspiracy. *Morgan v. Brush Wellman, Inc.*, 165 F. Supp. 2d 704, 721 (E.D. Tenn. 2001) (citing *Tenn. Publ'g Co. v. Fitzhugh*, 52 S.W.2d 157, 158 (1932)).

The purpose of a conspiracy claim is to ensure that each conspirator may be held " 'responsible for everything done by his confederate which the execution of the common design makes probable as a consequence'; in other words, each conspirator is liable for the damage caused by the other." *Brown v.*

*Birman Managed Care, Inc.*, 42 S.W.3d 62, 67 (Tenn. 2001) (quoting *Dale v. Thomas H. Temple Co.*, 208 S.W.2d 344, 353 (Tenn. 1948)); *accord Huckeby v. Spangler*, 521 S.W.2d 568, 573 (Tenn. 1975) ("There is no question but that when two or more persons engage in an unlawful act and one of them commits a serious civil injury upon a person not engaged therein, all are equally liable for damages to the injured party. . . . [A]ll persons involved in a civil conspiracy or other unlawful activity are jointly liable."). Thus:

> Conspiracy is not a cause of action, but a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration. By participation in a civil conspiracy, a coconspirator effectively adopts as his or her own the torts of other coconspirators within the ambit of the conspiracy. In this way, a coconspirator incurs tort liability co-equal with the immediate tortfeasors.

*Applied Equipment Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 511, 869 P.2d 454, 457 (Cal. 1994). *Accord Beck v. Prupis*, 529 U.S. 494, 503 (2000) (noting it was "sometimes said that a conspiracy claim was not an independent cause of action, but was only the mechanism for subjecting co-conspirators to liability when one of their member committed a tortious act"); *Halberstam v. Welch*, 705 F.2d 472, 479 (D.C. Cir. 1983) ("Since liability for civil conspiracy depends on performance of some underlying tortious act, the conspiracy is not independently actionable; rather, it is a means for establishing vicarious liability for the underlying tort").

In light of these principles, under ordinary circumstances, a claim for conspiracy to induce a breach of contract would apply, for example, if Public Storage and some third party participated in a scheme to induce Shurgard to breach its contract with Plaintiffs. Even if this hypothetical third party did not engage in the alleged underlying tort that caused Shurgard to breach its contract, that third party would nonetheless be liable for inducement of breach under the doctrine of conspiracy if it knew and intended that Public Storage would engage in those acts.

In this case, however, there is no such third party who could be vicariously liable under a conspiracy theory for acts actually committed by Public Storage, or for whose acts Public Storage could be vicariously liable. Regardless of whether Public Storage and Shurgard acted in concert, Shurgard cannot be liable in tort for inducing the breach of its own contract, *Ladd v. Roane Hosiery, Inc.*, 556 S.W.2d 758, 760 (Tenn. 1977), or conspiring to induce the breach of its own contract, *see Forrester v. Stockstill*, 869 S.W.2d 328, 330 (Tenn. 1994). Instead, it will either be liable for breach of contract or not. Likewise, Public Storage will either be liable for inducement of breach of contract by Shurgard or it will not. If not, then there would be no underlying tort

claim to sustain a claim for conspiracy. *Cf. Morgan*, 165 F. Supp. 2d at 721 (dismissing conspiracy claim where the underlying predicate tort claims were dismissed). If so, Public Storage will simply be liable for its own acts of inducement, not vicariously liable for acts committed by any other party. The addition (or subtraction) of a conspiracy claim in this particular case therefore will have no apparent effect on the facts pleaded or proved, the admissibility of evidence, or the amount of damages available to the Plaintiffs.

In short, the conspiracy claim in this case is completely without substance: Shurgard cannot be liable for the underlying inducement of breach claim and there is no other third party with whom Public Storage is alleged to have conspired. Because Plaintiffs have failed to state a viable conspiracy claim, the Court will grant Defendants' motion to dismiss Count VII of the Amended Complaint.

### D. Count I – Declaratory Relief

In Count I, all Plaintiffs, including FMC, seek a declaration that: (1) the new management agreements executed by Shurgard and Public Storage were entered into without authority under the Joint Venture Agreements and are therefore void or voidable; (2) the actions of Shurgard constituted "cause" within the meaning of the Joint Venture Agreements and, therefore, the Freegard Partnerships gave proper notice of the removal of Shurgard as managing venturer and Shurgard was properly removed as managing venturer; (3) the Freegard Partnerships are the managing venturers of the Joint Ventures; and (4) Old Shurgard wrongfully dissociated as a partner of the Joint Ventures and New Shurgard is not a partner of the Joint Ventures. In other words, Count I is concerned with the construction and application of the Joint Venture Agreements, to which FMC was not a party, and with the relationship between Shurgard and the Freegard Partnerships in the Joint Ventures. By reason of FMC's lack of involvement in the Joint Ventures, Defendants contend that plaintiff FMC is not entitled to seek any of the relief requested in Count I, and therefore that any claims asserted by FMC in Count I should be dismissed.

The federal Declaratory Judgment Act permits the federal courts, "upon the filing of an appropriate pleading, [to] declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a)). "District courts possess discretion in determining whether and when to entertain an action under the Declaratory Judgment Act, even when the suit otherwise satisfies subject matter jurisdictional prerequisites." *AmSouth Bank v. Dale*, 386 F.3d 763, 784 (6th Cir. 2004) (quoting *Wilton v. Seven Falls Co.*,

515 U.S. 277, 282 (1995)). In determining whether to exercise this discretion, courts must determine whether the case represents a controversy that is "definite and concrete, touching the legal relations of parties having adverse legal interests." *Aetna Life Ins. Co. of Hartford, Conn. v. Haworth*, 300 U.S. 227, 240–41 (1937). "Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941). In the actual implementation of this test, the Supreme Court has continuously emphasized that a substantial degree of concreteness is required in declaratory judgment actions. *See, e.g.*, *Laird v. Tatum*, 408 U.S. 1, 2 (1972) (mere chilling of First Amendment rights alleged by plaintiffs to result from their knowledge of the Army's surveillance of lawful civilian political activity failed to present a sufficiently concrete controversy to warrant declaratory action where the plaintiffs were not directly affected by such action nor in danger of being subject to such action); *Poe v. Ullman*, 367 U.S. 497 (1961) (no justiciable question was presented where plaintiffs failed to show that the statutes they challenged would be enforced against them).

Given these considerations, the Court concludes that FMC does not have a sufficient interest in the subject matter of Count I to have standing under the Declaratory Judgment Act to seek the particular declarations sought in that count. This conclusion is prompted, in large part, by the Plaintiffs' averment in the introductory paragraph of Count I that "[a]n actual controversy exists within the jurisdiction of this Court between the Plaintiffs and the Defendants *with respect to their rights and legal relations under the various joint venture agreements governing the [Joint Ventures]*." (1st Am. Compl. ¶ 48 (emphasis added).) To the extent FMC has any interest in the outcome of a declaration regarding the parties' rights and obligations under the Joint Venture Agreements, such interest is very tenuous and hypothetical (if the Court rules in favor of the Freegard Partnerships, and the Freegard Partnerships are reinstated as managing venturers of their respective Joint Ventures, the Freegard Partnerships *might* cause the Joint Ventures to enter into new management agreements with FMC, *if* the Joint Ventures continue to operate as they have in the past). The incidental effect on FMC of any ruling regarding the construction and application of the Joint Venture Agreements is not the type of "definite and concrete" controversy the Supreme Court has indicated is required.

The Court will therefore grant Defendant's motion to dismiss Count I with respect to Plaintiff FMC.

Defendants do not challenge the validity of Count I insofar as it is brought by the Freegard Partnerships.

## IV. CONCLUSION

To summarize: The Freegard Partnerships have stated a claim for inducement of breach of contract but have not stated a claim for tortious interference with prospective contract. The motion to dismiss Count V will therefore be granted in part and denied in part. Plaintiff FMC has not stated a viable cause of action for inducement of breach of contract or tortious interference with business relations or prospective contract, so the motion to dismiss Count VI in its entirety will be granted. Count VII, asserting conspiracy, will also be dismissed. FMC's claims in Count I will be dismissed because FMC is not a party to the Joint Venture Agreements that are the subject of that count.

An appropriate Order will enter.

Thomas A. Wiseman, Jr.
Senior U.S. District Judge