IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| FREEMAN MANAGEMENT CORPORATION, a Tennessee corporation, and FREEGARD PARTNERS I, FREEGARD PARTNERS III, FREEGARD PARTNERS IV, FREEGARD PARTNERS V, FREEGARD PARTNERS VI, and FREEGARD PARTNERS VIII, each a Tennessee general partnership, <br><br> Plaintiffs, <br><br> v. <br><br> SHURGARD STORAGE CENTERS, INC., and PUBLIC STORAGE, INC., <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) Case No. 3:06cv0736 ) ) ) ) ) ) |

## MEMORANDUM OPINION

Before the Court is Plaintiffs' Motion for Partial Summary Judgment (Doc. No. 32) in which five of the seven plaintiffs in this case (Freegard Partners I, Freegard Partners III, Freegard Partners IV, Freegard Partners VI and Freegard Partners VIII) (collectively, the "Freegard Partnerships") seek judgment as a matter of law in their favor on Counts I and II of the First Amended Complaint, the two counts asserted in the Amended Complaint (of seven) that seek non-monetary relief.[1]  Specifically, with respect to Count I, the Freegard Partnerships request that the Court enter a declaratory judgment providing that (1) the Freegard Partnerships, not Defendant Shurgard Storage Centers, Inc. ("New Shurgard"), are properly the Managing Venturers of the various joint ventures in which they are partners (collectively, the "Joint Venture Partnerships" or "Joint Ventures"); and (2) the management agreements executed by and between Defendant Public Storage, Inc. and Shurgard Storage Centers, LLC ("Old Shurgard") before it merged into New Shurgard, are void.

---

[1]The Court previously granted in part Defendants' motion to dismiss, dismissing Count V in part and, Counts VI and VII in their entirety.  Of relevance here, the Court also dismissed any claims asserted by Plaintiff Freeman Management Corporation in Count I.  (*See* Doc. No. 31.)

With respect to Count II, the Freegard Partnerships request entry of a permanent injunction that (1) prohibits New Shurgard from holding itself out as or exercising the powers of, Managing Venturer of the various Joint Venture Partnerships; and (2) prohibiting further violations by any of the Defendants of the Joint Venture Agreements, including by making allegedly unauthorized payments to Public Storage pursuant to the management agreements executed by Old Shurgard on or about July 14, 2006.

Defendants argue that Old Shurgard properly became the Managing Venturer pursuant to the terms of the Joint Venture Agreements, that the Freegard Partnerships are barred by the doctrines of laches, waiver or estoppel from objecting to the merger of Old Shurgard into New Shurgard, and that disputed issues of fact preclude summary judgment in favor of the Freegard Partnerships.

The motion has been fully, if not exhaustively, briefed and is ripe for consideration. For the reasons set forth below, the motion will be granted in part and denied in part.

## I.       STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor. *Id.* Not just any alleged factual dispute between the parties will defeat an otherwise properly supported motion for summary judgment; the dispute must present a genuine issue of material fact. *Leadbetter v. Gilley*, 385 F.3d 683, 689–90 (6th Cir. 2005). A dispute is "genuine" only if based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party. *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 451 (6th Cir. 2004). A factual dispute concerns a "material" fact only if its resolution might affect the outcome of the suit under the governing substantive law. *Id.*

## II.      FACTUAL BACKGROUND

The pertinent facts, viewed in the light most favorable to the Defendants as the non-moving parties, are as follows:

In 1993, Plaintiff Freeman Management Corporation ("FMC") entered into an Affiliation and Development Agreement with Shurgard Incorporated ("SI"), Old Shurgard's predecessor, pursuant to which

several joint ventures (and one limited liability company not implicated in the instant motion) were formed for the purpose of developing and operating self-storage facilities. In addition to the Affiliation and Development Agreement entered into by and between Old Shurgard and FMC ("Affiliation Agreement") (*see* Doc. No. 16, Ex. 1), Old Shurgard and each of the various Freegard Partnerships executed separate Joint Venture Agreements,[2] thus creating the general partnerships known as the (1) Shurgard-Freeman Hermitage Joint Venture; (2) the Shurgard-Freeman Medical Center Joint Venture; (3) the Shurgard-Freeman Franklin Joint Venture; (4) the Shurgard-Freeman Hickory Hollow Joint Venture; (5) the Shurgard-Freeman South Main Joint Venture; and (6) the Shurgard-Freeman Stone's River Joint Venture (collectively, the "Joint Venture Partnerships" or "Joint Ventures").[3] (*See* Doc. No. 34, Freeman Aff. ¶ 6.) Each of the Joint Venture Partnerships entered into a separate management services agreement with FMC pursuant to which FMC provided management services to the various operations for a fee. (Freeman Aff. ¶ 6.) For each Joint Venture Partnership, one of the Freegard Partnerships served as the Managing Venturer and subcontracted its management functions to FMC. (Freeman Aff. ¶ 7.) The management agreements entered into with FMC expressly stated that they would expire upon termination of the Affiliation Agreement. (*See* Doc. No. 16, Ex. 3 (Management Services Agreement), § II.) For more than ten years, the Joint Venture Partnerships operated successfully without significant difficulties or conflict between the parties.

In December 2004, however, Old Shurgard elected not to renew the Affiliation Agreement, thus setting it (and the management agreements with FMC) on course to expire on June 30, 2005. By early 2005, before Old Shurgard had any involvement with Public Storage, the Freegard Partnerships and FMC were aware that

---

[2]For purposes of this motion, the parties agree that the various Joint Venture Agreements are substantially identical. (*See, e.g.*, Doc. No. 34, Freeman Aff. ¶ 6(B) n.2 and Ex. 2; Doc. No. 55, Defs.' App., at Tab 7 (Shurgard-Freeman Stone's River Joint Venture Joint Venture Agreement) (hereafter, the "Joint Venture Agreement" or "JVA").)

[3]Only five of the Freegard Partnerships joined in this motion and only six, including Freegard Partners V, joined in this lawsuit. Other than Freegard Partners V, the parties have not made it clear which of the Freegard Partnerships are partners in which of the Joint Ventures with Shurgard, or why there are apparently six Joint Venture Partnerships (rather than five) in addition to the LLC referenced in Ed Freeman's affidavit (Doc. No. 34) submitted in support of the motion for summary judgment.

Old Shurgard wanted to assume management of the joint ventures and the property management duties.[4] (Freeman Aff. ¶ 10; Doc. No. 55, Defs.' App., at Tab 5.)

On June 1, 2005, the parties amended the Affiliation Agreement to continue on a month-to-month basis, terminable at will by either party with thirty days' notice. On March 7, 2006, more than a year after the Freegard Partnerships were notified of Old Shurgard's desire to assume the positions of Managing Venturer and Property Manager, Old Shurgard and Public Storage announced that they had entered into a Merger Agreement. Up until that time, Public Storage had been one of Old Shurgard's principal competitors.

Mr. Freeman, on behalf of FMC and the Freegard Partnerships, met with representatives of Public Storage (David Doll and Mike McGowan) on April 19, 2006. About the time of this meeting, Public Storage received a memorandum from the Plaintiffs' counsel (the "April 17 Memorandum") setting forth the Plaintiffs' position with respect to the relevant provisions of the Joint Venture Agreements, including many of the issues now presented in this lawsuit. (*See* Doc. No. 56, Doll Decl., Ex. 1 (April 17 Memo).) The purpose of the April 17 Memorandum, according to Mr. Freeman, was to "put Public Storage on notice that they are treading on dangerous water with me and there's potential litigation involved."[5] (Doc. No. 55, Defs.' App., Tab 2, Freeman Dep. at 148.) According to the April 17 Memorandum, the Joint Venture Agreements permitted Old Shurgard to replace the Freegard Partnerships as Managing Venturer by invoking what the parties refer to as the "deadlock provisions" contained therein. The Memorandum also recognized that the management agreements with FMC would terminate automatically as a result of terminating the Affiliation Agreement, and that, if the management contracts with FMC were terminated, the Managing Venturer would either have to

---

[4]Old Shurgard first indicated its desire to exercise control over the management of the Joint Venture Partnerships in 2005. These conversations led to negotiations regarding the sale of the Freegard Partnerships' interests in the Joint Ventures. By early 2006, negotiations had progressed to an "advanced stage," but ultimately no agreement was reached and no binding contract executed. (Freeman Aff. ¶ 10.) Because the Freegard Partnerships acknowledge that no agreement was reached regarding the sale of their interests, the fact that negotiations occurred is not relevant to these proceedings.

[5]Ed Freeman, owner of FMC and the Freegard Partnerships, testified in his Affidavit submitted in support of summary judgment that Public Storage stated during the meeting that it was not interested in continuing to operate the Joint Venture Partnerships in the same way they had been operated in the past and that the Freegard Partnerships might be "better off selling their interests." (Freeman Aff. ¶ 15.) Some negotiations occurred toward that end but, according to Mr. Freeman, the terms offered by Public Storage were not as attractive as those previously offered by Old Shurgard, so no agreement was reached. (*Id.*)

replace FMC with a non-affiliated management company or manage the joint ventures itself at no charge. (April 17 Memo at 6.)  The April 17 Memorandum did not mention the limitations on transfers of interest contained in the Joint Venture Agreements, nor did it expressly raise an objection to the announced Merger Agreement between Old Shurgard and Public Storage.  Public Storage maintains that it agreed with and relied upon the Plaintiffs' interpretations of the parties' agreements as set forth in the April 17 Memorandum.

On June 13, 2006, Old Shurgard sent notice to FMC that it was terminating the Affiliation and Development Agreement effective July 15, 2006, thereby also terminating the management agreements with FMC.  Old Shurgard also called meetings of the Joint Venture Partnerships on June 21, 2006 (the "June 21 Meeting") for the purpose of seeking approval of two specific actions proposed by Old Shurgard:  (1) removal of the Freegard Partnerships as Managing Venturer of each of the various Joint Venture Partnerships and installing Old Shurgard as the Managing Venturer in their place; and (2) appointment of Old Shurgard or Public Storage to replace FMC as the management company for the facilities owned by the Joint Venture Partnerships.  Representatives of Public Storage, Old Shurgard, FMC and the Freegard Partnerships attended the meeting, with counsel for the Plaintiffs explicitly consenting to the presence of Public Storage's representatives.

At the meeting Old Shurgard, of course, voted in favor of removing the Freegard Partnerships as Managing Venturers while the Freegard Partnerships voted against the proposal.  Immediately thereafter, Old Shurgard invoked the "deadlock provision" contained in § 5.2(b) of the Joint Venture Agreements (discussed in greater detail below).  According to Defendants, by operation of § 5.2(b), Old Shurgard became the Managing Venturer of the Joint Venture Partnerships.  The Freegard Partnerships insist that the invocation of § 5.2(b) was in violation of the contracts, while Defendants maintain that Old Shurgard's actions were consistent with any reasonable interpretation of the agreements.[6]

---

[6]The Freegard Partnerships insist that Old Shurgard took these steps at the express direction of Public Storage, and were pressured to do so because of the pending merger.  Specifically, Ed Freeman states in his affidavit that it was "clear to [him] that Public Storage wanted to obtain negotiating leverage for the forcing the Freegard Partnerships to sell their interests in the joint ventures," and that he was told by representatives of Old Shurgard and Public Storage that the business of Public Storage was incompatible with having partners. The Court finds that Mr. Freeman's speculative and hearsay evidence in that regard, even if it were admissible, is not relevant to the motion for summary judgment.

The Freegard Partnerships also voted against the proposal that the Joint Ventures enter into management agreements with Old Shurgard or Public Storage. Old Shurgard voted in favor of that provision and subsequently, acting in its capacity as the new Managing Venturer, caused the Joint Venture Partnerships to enter into management agreements with Public Storage. The Freegard Partnerships insist that this action likewise constituted a breach of the Joint Venture Agreements, because they did not consent to contracting with Public Storage, and the Agreements prohibit any joint venturer from contracting with an "affiliate" for the provision of services to the Joint Venture Partnerships without the unanimous consent of all joint venturers. Defendants, on the other hand, maintain that their action was consistent with their having already invoked the deadlock provision that permitted them to take unilateral action on any matter that otherwise required unanimous consent. In addition, Defendants argue that Public Storage was not an "affiliate" of Old Shurgard, as that term is defined in the Joint Venture Agreements, at the time it executed the management agreements[7] and that, even if it were, there was no violation of the Joint Venture Agreements because Public Storage has never been paid a fee for its management services.

Regardless, on July 25, 2006, the Freegard Partnerships sent notice to Old Shurgard that they were removing Old Shurgard as Managing Venturer for cause. The "causes" cited by the Freegard Partnerships were (1) Old Shurgard's removal of the Freegard Partnerships and appointment of itself as the Managing Venturer, despite not having achieved unanimous consent to take those actions, by invoking the deadlock provision; and (2) causing the Joint Venture Partnerships to enter into management agreements with Public Storage despite not having obtained the Freegard Partnerships' consent. (Doc. No. 34, Ex. 6 (Notice of Removal); Freeman Aff. ¶ 32.) On July 27, 2006, Old Shurgard responded that it did not accept removal as Managing Venturer and requested that the Freegard Partnerships provide a legal basis for their action. (Doc. No. 34, Ex. 7.) Plaintiffs filed their original Complaint the next day.

The merger of Old Shurgard into New Shurgard closed on August 22, 2006, approximately three weeks after Plaintiffs filed their initial Complaint. On October 18, 2006, Plaintiffs filed their First Amended Complaint, objecting for the first time to the merger as a prohibited transfer of interest. (Doc. No. 26, at ¶ 51.)

---

[7]The Joint Venture Agreement defines "affiliate" as "any person or entity directly or indirectly controlling, controlled by or under common control with another person or entity." (JVA § 5.6(b).)

III.    DISCUSSION AND ANALYSIS

In support of their motion for summary judgment and the relief sought therein, the Freegard Partnerships argue that Old Shurgard breached the Joint Venture Agreements in at least three instances, by:

> (1) invoking the deadlock provisions of the agreements solely for the purpose of removing the Freegard Partnerships as Managing Venturers without cause after failing to obtain the required unanimous consent necessary to effect such removal;
>
> (2) executing management agreements with Public Storage, an affiliate of Old (and New) Shurgard, on behalf of the Joint Ventures without unanimous consent; and
>
> (3) transferring Old Shurgard's interests in the Joint Venture Partnerships to New Shurgard in the course of the merger, without the consent of the Freegard Partnerships.

(Doc. No. 35, at 5.)

The Freegard Partnerships maintain that a finding by the Court that any one of these actions constituted a breach will be sufficient to support all or part of the relief sought in their motion.  They claim that a finding in their favor as to either of the first two alleged breaches would give them grounds to remove Old Shurgard as Managing Venturer and would entitle them to a declaration that the Freegard Partnerships are properly the Managing Venturers of the Joint Venture Partnerships and that the Management Agreements with Public Storage are null and void.  A finding that Old Shurgard improperly transferred its interests in the partnerships to New Shurgard will, the Freegard Partnerships claim, result in a determination that New Shurgard is not properly the Managing Venturer.

A.      The Applicable Legal Standards

In a diversity case such as this one, the Court must apply the law of the forum state including its rules regarding choice of law.  *Erie R.R. v. Tompkins*, 304 U.S. 64 (1938); *Vencor, Inc. v. Standard Life & Accident Ins. Co.*, 317 F.3d 629, 634–35 (6th Cir. 2003).  Tennessee follows the rule that questions of contract interpretation are governed by the law of the state the parties intended.  *See Frizzell Constr. Co. v. Gatlinburg, L.L.C.*, 9 S.W.3d 79, 85 (Tenn. 1999).  The Joint Venture Agreements at issue here provide specifically that they are to be "governed, construed, and enforced in accordance with the laws of the State of Tennessee." (JVA § 11.4(d)).

Under Tennessee law, the interpretation of an unambiguous contract is a question of law for the Court to decide.  *Doe v. HCA Health Servs. of Tenn., Inc.*, 46 S.W.3d 191 (Tenn. 2001).  The Court's primary

purpose in construing a contract is to determine what the parties intended at the time of contracting. *Ohio Cas. Co., Inc. v. Travelers Indem. Co.*, 493 S.W.2d 465, 467 (Tenn.1973). When the language of a contract is plain and unambiguous, the Court must ascertain the parties' intention from the four corners of the writing. *Simonton v. Huff*, 60 S.W.3d 820, 825 (Tenn. Ct. App. 2000). However, where a contract provision is ambiguous, the parties' intent cannot be determined by a literal interpretation of the language. *Planters Gin Co. v. Fed. Compress & Warehouse Co.*, 78 S.W.3d 885, 890 (Tenn. 2002). In that situation, courts must resort to other rules of construction, and only if ambiguity remains after application of the pertinent rules does the legal meaning of the contract become a question of fact. *Id.*

A contract is ambiguous only when it is of uncertain meaning and may fairly be understood in more ways than one. *Id.*; *Rebound Care Corp. v. Universal Constructors, Inc.*, No. M1999-00868-C0A-R3, 2000 WL 758610, *4 (Tenn. Ct. App. June 13, 2000). An ambiguity does not arise in a contract merely because the parties may differ as to interpretation of certain of its provisions. *Oman Constr. Co. v. Tenn. Valley Auth.*, 486 F. Supp. 375, 382 (M.D. Tenn. 1979). A strained construction may not be placed on the language used to find an ambiguity where none exists. *Empress Health & Beauty Spa, Inc. v. Turner*, 503 S.W.2d 188, 190–91 (Tenn. 1973). The Court is to consider the agreement as a whole in determining whether the meaning of the contract is clear or ambiguous. *Gredig v. Tenn. Farmers Mut. Ins. Co.*, 891 S.W.2d 909, 912 (Tenn. Ct. App. 1994).

**B.    Whether Old Shurgard Breached the Joint Venture Agreements by Invoking the "Deadlock Provision" to Remove the Freegard Partnerships as the Managing Venturers of the Joint Venture Partnerships**

Section 5 of the Joint Venture Agreement provides that the Joint Venture Partnerships are to be managed only by the Managing Venturer, "[e]xcept where the consent of both Joint Venturers is required." (JVA § 5.1.) The Agreement then enumerates twenty-one actions that require the consent of both Joint Venturers, including such matters as borrowing money, making loans, investing the assets of the Joint Venture, and other similar major decisions. (*See* JVA § 5.2(a)(i) – (vvi).) Another of the actions that require unanimous consent is "[r]eplacing the Managing Venturer for any reason other than 'cause' as defined in [the Joint Venture Agreement]." (JVA § 5.2(a)(xiv).)

The very next subsection, however, which is the contract clause to which the parties refer as the

"deadlock provision," contemplates that the requirement for a unanimous decision set forth in § 5.2(a) may be overridden:

> If the Joint Venturers are not able to reach a Unanimous Decision with respect to any of the matters set forth in Section 5.2(a)(i) through (iv) or (vi) through (xx), either Joint Venturer shall have the right to invoke the provisions of this Section 5.2(b).

(JVA § 5.2(b).) That section then goes on to provide that either Shurgard or the Freegard Partnership may invoke its terms, and in either event, regardless of which party takes the action, Shurgard will immediately become the Managing Venturer and the Freegard Partnership acquires the right to require Shurgard to purchase its interest in the Joint Venture. (JVA §§ 5.2(b)(i)(A) & (B) and (b)(ii)(A) & (B).) The remainder of Section 5.2(b) concerns the purchase terms, which vary depending upon which party invoked § 5.2(b), and also includes a non-compete provision and de-affiliation guidelines.

There is no dispute that Old Shurgard properly gave notice of termination of the Affiliation Agreement effective July 15, 2006, and that termination of the Affiliation Agreement also had the effect of automatically terminating the management agreements with FMC. Old Shurgard called a meeting of the Joint Venture Partnerships on June 21, 2006 to seek removal of the Freegard Partnerships as Managing Venturer of each of the various Joint Venture Partnerships and installing Old Shurgard as the Managing Venturer in their place, as well as to determine who would succeed FMC as manager of the Joint Ventures. As discussed above, when the parties voted whether to remove the Freegard Partnerships as Managing Venturer and replace them with Old Shurgard, each Freegard Partnership voted no, while Old Shurgard voted yes. In other words, the parties did not consent unanimously to removal of the Freegard Partnership, which is one of the actions specified in § 5.2(a) of the Joint Venture Agreement as requiring the unanimous consent of both Joint Venturers. Upon reaching this impasse, Old Shurgard exercised its right to invoke the provisions of § 5.2(b), and maintains that by doing so, it automatically became the Managing Venturer and triggered the Freegard Partnerships' right to require Old Shurgard to purchase its interests in the Joint Ventures in accordance with the terms laid out in the remainder of § 5.2(b).

The Freegard Partnerships insist this action constituted a breach of the Joint Venture Agreements because, they claim, the contracts unambiguously provide that a Managing Venturer cannot be removed by means of invoking § 5.2(b)). More precisely, Plaintiffs insist that the specific language of § 5.2(a), requiring

unanimous consent to remove the Freegard Partnerships as Managing Venturers except for "cause," is in conflict with the more general provisions of § 5.2(b) permitting Old Shurgard to remove the Freegard Partnerships without cause and without unanimous consent. The Freegard Partnerships argue further that general rules of contract construction require that the more specific provision prevail over the more general provision, and therefore that Old Shurgard breached the contract when it invoked § 5.2(b) solely to avoid the unanimous consent requirement of § 5.2(a)(xiv). Alternatively, the Freegard Partnerships argue that, to the extent there is any ambiguity, the parties did not intend that the "deadlock provisions" would be used to overcome the unanimous consent requirement pertaining to removal of the Freegard Partnerships as Managing Venturers.

The Freegard Partnerships' arguments notwithstanding, the Court finds that the Joint Venture Agreement unambiguously permitted the action taken by Old Shurgard. Under ordinary principles of contract construction, the Court must consider the contract as a whole, and must in particular construe the entirety of § 5 as internally consistent if such a reading is plausible. *See Gredig*, 891 S.W.2d at 912 ("All provisions of a contract should be construed as in harmony with each other, if such construction can be reasonably made, so as to avoid repugnancy between the several provisions of a single contract." (quoting *Rainey v. Stansell*, 836 S.W.2d 117, 119 (Tenn. Ct. App. 1992)). Here, § 5.2(a) and § 5.2(b) are not in conflict. Rather, they clearly were intended to work together: Section 5.2(b) defines the procedures to be used when the Joint Venturers cannot agree on the matters listed in § 5.2(a). Section 5.2(b) specifically states that if unanimous consent is not reached "with respect *to any of the matters set forth* in Section 5.2(a)(i) through (iv) or (vi) through (xx), *either Joint Venturer shall have the right to invoke the provisions of this Section 5.2(b).*" (JVA § 5.2(b) (emphasis added).) Replacing the Managing Venturer for any reason other than cause, addressed in § 5.2(a)(xiv), is expressly included among the matters regarding which either party may invoke § 5.2(b). Old Shurgard's decision to do so was therefore in accordance with the unambiguous terms of the contract.

The Freegard Partnerships also argue that Old Shurgard's action violated its duty of good faith and fair dealing. Under Tennessee law, however, this duty "does not extend beyond the agreed upon terms of the contract and the reasonable contractual expectation of the parties." *Wallace v. Nat'l Bank of Commerce*, 938 S.W.2d 684, 687 (Tenn. 1996). Taking an action explicitly contemplated and permitted by unambiguous

contract terms therefore cannot give rise to a claim for breach of the duty of good faith and fair dealing. *See id.* ("Performance of a contract according to its terms cannot be characterized as bad faith."); *Barnes & Robinson Co. v. OneSource Facility Servs., Inc.*, 195 S.W.3d 637, 643 (Tenn. Ct. App. 2006) ("The implied obligation of good faith and fair dealing does not . . . create new contractual rights or obligations, nor can it be used to circumvent or alter the specific terms of the parties' agreement.").

The Freegard Partnerships' argument that Old Shurgard breached the JVA by invoking § 5.2(b) in order to remove and replace the Freegard Partnerships as Managing Venturers is therefore without merit.

> **C.    Whether Old Shurgard's Act of Causing the Joint Ventures to Execute Management Contracts with Public Storage without the Freegard Partnerships' Consent Constituted Breach of Contract**

Another action requiring the unanimous consent or agreement of both joint venturers is, "[e]xcept as set forth in Section 5.6, entering into any agreements with any Joint Venturer or affiliate thereof for the provision of goods or services to the Joint Venture." (JVA § 5.2(a)(vi).)  Section 5.6 permits the Joint Ventures to enter into a management agreement with FMC, but not with any affiliate of Old Shurgard.  Section 5.2(a)(vi) is, as indicated above, one of the items expressly enumerated in § 5.2(b) concerning which either party may invoke the provisions of that subsection in the event of an impasse or deadlock.

At the June 22, 2006 meeting, another of the proposals upon which the parties voted was to replace FMC as property manager (given that the management agreements were on track to expire on July 15, 2006) with Public Storage, pursuant to the terms of the form Management Services Agreement previously forwarded by Old Shurgard to the Freegard Partnerships.  The Freegard Partnerships opposed the motion while Old Shurgard voted in favor of it.  Old Shurgard, having already invoked § 5.2(b), subsequently proceeded to cause the Joint Ventures to execute management agreements with Public Storage despite the Freegard Partnerships' objections.  The Joint Ventures entered into new management agreements with Public Storage between July 14 and July 16, 2006.

The Freegard Partnerships argue here that (1) Public Storage was an affiliate of Old Shurgard at the time the Joint Ventures executed the new management agreements, by virtue of the fact that Public Storage

and Old Shurgard had executed the merger agreement;[8] (2) the Freegard Partnerships never consented to the Joint Ventures' entering into management contracts with Public Storage; and (3) Old Shurgard's act of causing the Joint Ventures to enter into such agreements therefore constituted a breach of the Joint Venture Agreements.

In response, Defendants argue that, even assuming that Public Storage was an "affiliate" of Old Shurgard (which they deny), "[t]he only plausible construction of the Joint Venture Agreements is that invocation of the deadlock provision permits the newly appointed Managing Venturer (Old Shurgard) to unilaterally make those decisions that formerly required unanimous consent. Indeed, this is how Old Shurgard had interpreted the deadlock provisions." (Doc. No. 53, at 13.) Otherwise, Defendants argue,

> the automatic appointment of Old Shurgard as the Managing Venturer would be meaningless. The joint venture would remain at an impasse over the annual budget, or extending credit on a receivable, or any of the issues that require unanimity, unless and until the Freegard partnership decided to invoke the buyout provision. In the event that the Freegard partnership declined to invoke its buyout rights—the situation that confronted the parties herein—the impasse would continue until expiration of the term of the joint venture agreement. . . . The construction [Plaintiffs] propose would defeat the purpose of having a deadlock provision.

(Doc. No. 53, at 14.) Defendants maintain that Old Shurgard was entitled to invoke the deadlock provision at the June 21 Meeting as a result of the disagreement as to both of the proposals it brought to the table at that meeting—the second being the replacement of FMC as property manager with Public Storage—and that if they had not exercised the right to act unilaterally, the parties would still be at an impasse over the issue of who should be property manager.

The Court finds that Defendants' argument in some respects presses for an overly broad interpretation of the Joint Venture Agreement. For instance, hypothetically speaking, if the only issue discussed at the June 21 Meeting was the removal and replacement of the Freegard Partnerships as Managing Venturers, and Old Shurgard had invoked § 5.2(b) solely for the purpose of placing itself in the position of Managing Venturer, the parties could in theory have continued to operate as usual, still governed by terms of the Joint Venture Agreement as they had for the previous eleven years, unless the Freegard Partnerships exercised their right

---

[8]At the time the new management agreements were executed, Old Shurgard and Public Storage had executed a merger agreement but had not yet closed on the merger. The merger of Old Shurgard into New Shurgard closed on August 22, 2006.

to require Old Shurgard to buy out their interests. The only difference would have been that Old Shurgard rather than the Freegard Partnerships would act as Managing Venturer. Old Shurgard would not, as Managing Venturer, have had a continuing right to make unilateral decisions on issues requiring unanimous consent unless the parties actually reached an impasse on a particular issue and Old Shurgard again exercised its right to invoke § 5.2(b). At that point, the Freegard Partnerships' ability to require a buyout would be re-triggered. In other words, invocation of § 5.2(b) did not require the automatic disintegration of the parties' business relationship unless the Freegard Partnerships chose to exercise their buy-out rights.

In this instance, however, Old Shurgard apparently invoked § 5.2(b) in connection with both the proposals on the table at the June 21 Meeting, for the purpose of overriding the Freegard Partnerships' rejection of both proposals. Both of the actions taken by Old Shurgard—removal of the Freegard Partnerships as Managing Venturers and appointment of Public Storage as manager of the Joint Ventures (assuming Public Storage qualified as Old Shurgard's "affiliate")—gave the Freegard Partnerships the right to exercise their buyout rights. The Freegard Partnerships chose not to exercise that right.

Because the Court finds that Old Shurgard's action of entering into the Management Agreements with Public Storage was consistent with § 5.2(b) and did not constitute a breach of contract, the Court does not reach the Defendants' alternative arguments.[9]

> **D.** **Whether the Transfer of Old Shurgard's Interests in the Joint Venture partnerships to New Shurgard without Plaintiffs' Consent Constituted a Breach of the Joint Venture Agreements**

Filed contemporaneously with this Memorandum are the Court's Memorandum and Order in which the Court denies the Defendants' motion to dismiss the Freegard Partnerships' "dissociation claims." (Doc.

---

[9]Although the Court does not reach the issue of whether Public Storage would properly be considered Old Shurgard's "affiliate" under the terms of the agreement, the fact that the parties were a month away from entering into a parent-subsidiary relationship and that the management agreement contemplated immediate termination if the merger agreement terminated without closing, strongly suggests that the parties were "affiliated" for purposes of § 5.2(a). Moreover, although Public Storage claims the contract terms permitted it to provide management services if it did not charge a fee, the Joint Venture Agreement forbids contracting with an affiliate altogether. Here, a contract with an affiliate for the provision of management services to the Joint Ventures was executed. The Management Agreement provides for Public Storage to be paid a monthly management fee equal to the greater of $3000 or six percent of the gross revenue derived from the property. This contract was clearly one that would have required unanimous consent of all Joint Venturers but for the invocation of § 5.2(b).

Nos. 81 and 82.) The basis for the Court's holding is that the merger of Old Shurgard into New Shurgard constituted a transfer by operation of law of Old Shurgard's interest in the Joint Ventures, which required the Freegard Partnerships' consent pursuant to § 6.1 of the Joint Venture Agreement. Based upon the analysis set forth in the Memorandum Opinion addressing that issue, the Court finds, for purposes of the Freegard Partnerships' present motion for summary judgment, that closure of the merger without obtaining the Freegard Partnerships' consent constituted a breach of the Joint Venture Agreements, and an Event of Default as defined by § 7.1(d) thereof, *unless* some valid equitable defense applies.

Defendants argue that to the extent the merger constituted a prohibited transfer of interest by operation of law, the Freegard Partnerships should be barred from asserting a claim based thereon under the doctrines of estoppel, waiver, laches and/or acquiescence. Specifically, Defendants maintain that if the Freegard Partnerships had voiced their objection to the merger in a timely fashion, the transaction could and would have been constructed in a manner expressly permitted by the Joint Venture Agreements.[10] Defendants assert that they relied, to their detriment, on the Freegard Partnership's April 17 Memorandum and the Plaintiffs' failure generally to object to the merger prior to its closure to conclude that the Freegard Partnerships did not intend to object to the merger. As a result, Defendants assert the Freegard Partnerships are now estopped from objecting to the merger. Alternatively, Defendants argue that, at a minimum, there are disputed issues of fact concerning these defenses such that the Freegard Partnerships are not entitled to summary judgment.

As one Tennessee court has observed:

Though distinguishable, the concepts of laches, waiver, acquiescence, and estoppel are frequently discussed together, or in various combinations, because the factual situations giving rise to these defenses often involve elements of each doctrine. For example, apparent acquiescence in a course of conduct can: (1) raise the inference of an implied waiver of

---

[10] Section 6.1(a) of the Joint Venture Agreements states that, "[n]otwithstanding" the other restrictions on transfers of interest, "Shurgard shall be entitled to transfer part or all of its Joint Venture interest to a wholly owned subsidiary without the consent of FreeGard." Thus, Defendants argue, if Shurgard had conveyed its interests in the Joint Venture to a wholly owned subsidiary and then merged into Public Storage, the Freegard Partnerships would have no basis for arguing that the merger constituted a prohibited transfer, since the ownership of the of the joint venture interests would remain with the "drop-down" subsidiary. According to Defendants, Old Shurgard and Public Storage considered structuring the merger in such a manner, but concluded it would be unnecessary based on the Freegard Partnerships' failure to raise any objections to the merger. (*See* Doll Decl. at ¶ 8 & n.2; Defs.' App. at 9 (Doll Dep. at 133).)

rights; (2) result in unreasonable delay sufficient to support the defense of laches; or (3) estop a party from claiming the benefit of a situation his failure to act has contributed to creating.

*Strickler v. Garrison*, No. 03A01-9705-CH-00181, 1997 WL 772848, *4 (Tenn. Ct. App. Dec. 11, 1997). The Court will examine the doctrines of waiver, estoppel and laches and consider their applicability here.[11]

### i. Waiver

Waiver has long been defined under Tennessee law as the "voluntary relinquishment of a known right." *Dallas Glass of Hendersonville, Inc. v. Bituminous Fire & Marine Ins. Co.*, 544 S.W.2d 351, 354 (Tenn. 1976); *Baird v. Fidelity-Phenix Fire Ins. Co.*, 162 S.W.2d 384, 389 (Tenn. 1942). Tennessee courts have repeatedly held that, in order for a party to abandon or waive a legal right,

> there must be a clear, unequivocal, and decisive act of the party showing such a purpose, or acts amounting to an estoppel on [its] part. . . . Abandonment or waiver of a right important to parties *cannot be made out by uncertain implication, but ought clearly to appear.* To constitute such a waiver of a benefit there must be *clear, unequivocal, and decisive acts of the party*, an act which shows a determination not to have the benefit intended.

*Ky. Nat'l Ins. Co. v. Gardner*, 6 S.W.3d 493, 498–99 (Tenn. Ct. App. 1999) (emphasis added; citations and internal quotation marks omitted).

The law will not presume a waiver, and the party claiming the waiver has the burden of proving it by a preponderance of the evidence. *Id.* at 499 (citing *Koontz v. Fleming*, 65 S.W.2d 821, 825 (Tenn. Ct. App. 1933); *Springfield Tobacco Redryers Corp. v. City of Springfield*, 293 S.W.2d 189, 198 (Tenn. Ct. App. 1956)). Waiver may be proved by "express declaration; or by acts and declarations manifesting an intent and purpose not to claim the supposed advantage; or by a course of acts and conduct, or by so neglecting and failing to act, as to induce a belief that it was [the party's] intention and purpose to waive." *Ky. Nat'l Ins. Co.*, 6 S.W.3d at 499 (quoting *Baird*, 162 S.W.2d at 389). In order to establish waiver by conduct, however, the proof must show some "absolute action or inaction inconsistent with the claim or right" waived. *Koontz*, 65 S.W.2d at 825.

---

[11]The defense of "acquiescence," which Defendants raise obliquely but do not specifically address, does not appear to have been independently defined in Tennessee case law but is used imprecisely to refer to an action that may give rise to the defenses of waiver, estoppel or laches. *See, e.g., Strickler* 1997 WL 772848, at *5 ("[T]he right to enforce a restrictive covenant can be lost due to acquiescence by waiver or estoppel."). Similarly, the Sixth Circuit's definition of the term renders it basically indistinguishable from implied or express waiver. *See Elvis Presley Enters., Inc. v. Elvisly Yours*, 936 F.2d 889, 895 (6th Cir. 1991) (defining acquiescence as an intentional failure to protect one's rights, and noting that the defense requires proof of "conduct on the plaintiff's part that amounted to an assurance to the defendant, express or implied, that plaintiff would not assert his . . . rights against the defendant").

"Specifically, the record must show conduct on the part of [the party against whom waiver is sought] which is so clearly inconsistent with an intention to insist upon a strict compliance with the [contractual] provision at issue that the conduct constitutes an implied waiver." *Ky Nat'l Ins. Co.*, 6 S.W.3d at 499 (finding that Kentucky National had not waived its subrogation rights by failing to intervene in an underlying action, where it was permitted but not required to intervene in order to protect its subrogation rights).

In the case at bar, Defendants argue that the Freegard Partnerships waived their right to contest the merger by failing to voice their objection to it in time to permit the Defendants to structure the acquisition in such as way as to avoid any potential violation of the Joint Venture Agreement. In other words, Defendants are essentially arguing that the Freegard Partnerships, "by so neglecting and failing to act . . . induce[d] a belief that it was [their] intention and purpose to waive" their right to object to the merger. *See Ky. Nat'l Ins. Co.*, 6 S.W.3d at 499. The undisputed facts in this regard are that the April 17 Memorandum that Plaintiffs' counsel submitted to Defendants' counsel did not address the then-pending merger of Old Shurgard into New Shurgard, and the topic was never actually discussed among the parties.

Defendants, however, were clearly aware of the possibility that the merger might constitute a prohibited transfer of interest, given that they discussed the possibility of restructuring the transaction to avoid that possibility, and given that one of Shurgard's attorneys had voiced his opinion that the merger would required the Freegard Partnerships' consent.[12] Defendants chose not to raise the issue with the Freegard Partnerships. Moreover, prior to the closing of the merger, the Freegard Partnerships had clearly indicated an intention to protect their rights under the Joint Venture Agreements generally, including through litigation if necessary, and had likewise indicated their over-arching objection to Public Storage's entry onto the scene.

These undisputed facts simply do not support an implication that the Freegard Partnerships voluntarily relinquished a right contest the merger as violating the Joint Venture Agreement. Defendants cannot point to any conduct on the part of the Freegard Partnerships "which is so clearly inconsistent with an intention to insist upon a strict compliance with the [contractual] provision at issue that the conduct constitutes an implied

---

[12]The Court does not address the ultimate admissibility of the Rodan Memo, but simply observes that its existence corroborates the implication that the Defendants were aware that the merger might implicate the anti-transfer provision in the Joint Venture Agreements.

waiver." *Ky. Nat'l Ins. Co.*, 6 S.W.3d at 499. Defendants' argument that the Freegard Partnerships waived their right to contest the merger therefore fails.

<em><strong>ii.      Equitable Estoppel</strong></em>

While waiver is an intentional relinquishment, "the indispensable elements of an estoppel are ignorance of the party who invokes the estoppel, a representation by the party estopped which misleads, and an innocent and deleterious change of position in reliance on that representation." *Webb v. Board of Trustees of Webb School*, 271 S.W.2d 6, 19 (Tenn. Ct. App. 1954) (quoting 56 Am. Jur. Waiver, at 104). More precisely, with respect to the party against whom an estoppel argument is asserted, the following elements must be proved: "(1) Conduct which amounts to a false representation or concealment of material facts, or, at least, which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) Intention, or at least expectation that such conduct shall be acted upon by the other party; (3) Knowledge, actual or constructive[,] of the real facts." *Osborne v. Mountain Life Ins. Co.*, 130 S.W.3d 769, 774 (Tenn. 2004) (quoting *Consumer Credit Union v. Hite*, 801 S.W.2d 822, 825 (Tenn. Ct. App. 1990)). In addition, the party asserting the doctrine of estoppel must show that he (1) lacked knowledge and the means of knowledge of the truth as to the facts in question; (2) relied upon the conduct of the party estopped; and (3) took action based upon this reliance so as to change his position prejudicially. *Id.* (quoting *Consumer Credit Union*, 801 S.W.2d at 825)). "It is also the rule in this State that equitable estoppel embraces not only ideas conveyed by words written or spoken and things actually done but includes the silence of one under a duty to speak and his omission to act, as well; negligent silence may work an equitable estoppel. . . ." *Lusk v. Consol. Aluminum Corp.*, 655 S.W.2d 917, 920 (Tenn. 1983), *cited in Burks v. Elevation Outdoor Adver., LLC*, ___ S.W.3d ___, 2006 WL 2052337, at \*11–\*12 (Tenn. Ct. App. July 24, 2006), *perm. appeal denied* (Tenn. Dec. 18, 2006). The doctrine of equitable estoppel is not favored under Tennessee law, and the party asserting the doctrine bears the burden of proving each and every element necessary to such claim. *Robinson v. Tenn. Farmers Mut. Ins. Co.*, 857 S.W.2d 559, 563 (Tenn. Ct. App. 1993); *Bokor v. Holder*, 722 S.W.2d 676, 680 (Tenn. Ct. App. 1986).

Here, it is clear that the Freegard Partnerships may have been some what negligent in their failure to speak up or object to the merger in a more timely fashion, but there is no indication that they intentionally

did or failed to do anything for the purpose of inducing reliance. Moreover, the Defendants have not shown that the Freegard Partnerships had a *duty* of any kind to object to the merger before it closed, nor was Defendants' reliance entirely innocent. The facts in this case demonstrate that Defendants were fully aware of § 6.1 and the potential that it might be construed to require the Freegard Partnership's consent to the merger. Thus, to the extent they allegedly relied on the Freegard Partnerships' silence, such reliance was not reasonable: All they had to do was ask in order to ascertain the Freegard Partnerships' position. Instead, they affirmatively chose the route of silence, perhaps with the hope that if they ignored the problem it might never arise. Consequently, the defense of equitable estoppel does not apply under the facts presented here.

### iii.    Laches

As for the doctrine of laches, Mr. Justice Lansden, writing for the Tennessee Supreme Court in 1911, stated as follows:

> Relief is generally refused by courts of equity, because of the lapse of time, only in such cases where the loss of evidence, death of witnesses or parties, and failure of memory resulting in the obscuration of facts to the prejudice of the defendant, render uncertain the ascertainment of truth, and make it impossible for the court to pronounce a decree with confidence. . . . The doctrine of laches in courts of equity is not an arbitrary or a technical doctrine. No hard and fast rule for its application can be formulated. But, when the court sees negligence on one side and injury therefrom on the other, it is a ground for denial of relief. It is not required that the defendant should establish by proof an affirmative injury. It is sufficient if by the laches and delay of complainant it has become doubtful whether the defendant can command the evidence necessary to a fair presentation of the case. Or, if it can be seen that the defendant has been deprived of an advantage he might have had if the complainant's claim had been seasonably presented, a court of equity will not interfere to grant relief.

*Evans v. Steele*, 125 Tenn. 483, 494–95, 145 S.W. 162 (1911), *quoted in Murphy v. Emery*, 629 S.W.2d 895, 898 (Tenn. 1981). *See also John P. Saad & Sons, Inc. v. Nashville Thermal Transfer Corp.*, 715 S.W.2d 41, 46 (Tenn. 1986) ("The neglect of a person to make complaint, or bring suit in due season, he being *sui juris* and knowing the facts, or having the means of knowledge, is called laches; and where there has been gross laches in prosecuting rights, or long and unreasonable acquiescence in adverse rights, Courts of Equity refuse to interfere, they act either by analogy to the statutes of limitations, or upon their own inherent doctrine of discouraging antiquated demands. The Court realizes the difficulty of doing entire justice, when the original transaction has become obscured by time and the evidence lost, and deems it good public policy to allow claims and titles long acquiesced in to remain in repose." (quoting *Ledford v. Lee*, 29 Tenn. App. 660, 200

S.W.2d 393, 398 (Tenn. Ct. App. 1946) (quoting Gibson's Suits in Chancery, § 70, p. 87))).

According to Sixth Circuit common law, laches is the "negligent and unintentional failure to protect one's rights." *Nartron Corp. v. STMicro Electronics, Inc.*, 305 F.3d 397, 408 (6th Cir. 2002). The party asserting laches has the burden of showing lack of diligence by the party against whom the defense is asserted and prejudice by the party asserting it. The type of prejudice that much be shown is the inability to muster evidence because of the passage of a long period of time. *See, e.g.*, *Murphy v. Emery*, 629 S.W.2d 895 (Tenn. 1981) (finding plaintiff's suit was barred by the doctrine of laches where she delayed eleven years before bringing suit, resulting in prejudice to the defendant in the form of the loss of witnesses by death); *Nunley v. Nunley*, 925 S.W.2d 538, 542 (Tenn. Ct. App. 1996) (noting that seventeen year delay before plaintiff took action to protect his rights was unreasonable and caused prejudice to the defendant in defending against the claim, and clarifying that the type of prejudice that will support the defense of laches is delay that results in the unavailability of evidence, for instance the loss of proof, death of witnesses, and impairment to witnesses' memories or mental facilities).

Defendants in the present dispute have not shown sufficient delay nor the type of prejudice caused by delay that would permit them to establish the defense of laches. In sum, therefore, the Freegard Partnerships are not barred by any equitable doctrine from asserting that the merger effected without their consent constituted breach and default of the Joint Venture Agreements.

## IV. THE APPROPRIATE RELIEF

### A. Legal Standards for Issuing a Declaration or Permanent Injunction

As indicated above, the Freegard Partnerships seek summary judgment on Counts I and II of the Amended Complaint. With respect to Count I, they request that the Court enter a declaratory judgment providing that (1) the Freegard Partnerships, not New Shurgard, are properly the Managing Venturers of the various Joint Ventures in which they are partners; and (2) the management agreements executed by and between Public Storage and Old Shurgard before it merged into New Shurgard, are void. Further, they request entry of a permanent injunction that (1) prohibits New Shurgard from holding itself out as or exercising the powers of, Managing Venturer of the various Joint Venture Partnerships; and (2) prohibiting further violations by any of the Defendants of the Joint Venture Agreements, including by making unauthorized

payments to Public Storage pursuant to the management agreements executed by Old Shurgard on or about July 14, 2006.

The Court has concluded that Old Shurgard committed a material default of the Joint Venture Agreement when it merged into New Shurgard and thereby effected a transfer of Old Shurgard's interests by operation of law without the Freegard Partnerships' consent, but the fact that a breach occurred does not necessarily entitle the plaintiffs to a declaration or a permanent injunction.

This Court has the power to issue declarations of legal effect pursuant to the Declaratory Judgment Act, which provides in pertinent part:

> In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.

28 U.S.C. § 2201(a). Further, the Sixth Circuit has articulated five factors district courts should consider in deciding whether to exercise their discretion to issue a declaration:

> (1) whether the declaratory action would settle the controversy; (2) whether the declaratory action would serve a useful purpose in clarifying the legal relations in issue; (3) whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for a race for res judicata;" (4) whether the use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction; and (5) whether there is an alternative remedy which is better or more effective.

*Grand Trunk W. R.R. Co. v. Consol. Rail Corp.*, 746 F.2d 323, 326 (6th Cir. 1984).

Likewise, the Supreme Court has recently reiterated the familiar four-factor test that a plaintiff seeking a permanent injunction must satisfy before a court may grant such relief:

> A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay Inc. v. MercExchange, L.L.C.*, ___ U.S. ___, 126 S. Ct. 1837, 1839 (2006).

The Freegard Partnerships address these factors, albeit somewhat cursorily, in their brief; Defendants have not addressed them at all.

### B.      Application of the Legal Standards

#### i.      Declaration

Under the terms of the Joint Venture Agreement:

> [A]ny person who acquires, in any manner whatsoever, the interest, or any portion thereof, of a Joint Venturer, shall not be a Joint Venturer without the prior written approval of the other Joint Venturer. Such person shall, to the extent of the interest transferred to such person, acquire no more than that Joint Venturer's share in the net profits and losses and Net Cash from Operations . . . . Except as provided in this Section 6, no such person shall have any right to participate in the management of the affairs of the Joint Venture.

(JVA § 6.1(b).) By virtue of this provision, the Court finds that issuance of a declaration will settle a significant portion of the present dispute and will, at a minimum, serve a useful purpose by clarifying the legal relations between the parties. There is no evidence that the plaintiffs are engaging in legal fencing (and there is no parallel state court action pending or threatened) and the issuance of a declaration is not likely to infringe on or encroach upon state court jurisdiction. Finally, Defendants have not argued that an alternative remedy would be preferable, and the Court is not aware of any that would be. Consequently, the Court finds that the Freegard Partnerships are entitled to a judicial declaration that they, and not New Shurgard, are properly the Managing Venturers of the various Joint Ventures in which they are partners.

Notwithstanding, when the Joint Ventures entered into the Property Management Agreements with Public Storage on or about July 16, 2006, the merger had not yet closed and Old Shurgard had apparent authority as Managing Venturer at that time to cause the Joint Ventures to enter into the Management Agreements (as discussed above). The parties have not expressly addressed what effect the Court's finding that New Shurgard is no longer Managing Venturer, and technically no longer a Joint Venturer, would have on the Freegard Partnerships' ability to terminate the Management Agreements between the Joint Ventures and Public Storage. Obviously, the fact that the Freegard Partnerships will now be in a position to manage the Joint Ventures does not necessarily give them the ability unilaterally to terminate otherwise valid contracts. The Court therefore finds that it is not appropriate at this time to award summary judgment in favor of the Freegard Partnerships in the form of a declaration that the Management Agreements between Public Storage and the Joint Ventures are void.

### ii. Permanent Injunction

Under the principles articulated above, the Court finds that the Freegard Partnerships are also entitled to a permanent injunction prohibiting New Shurgard from holding itself out as the Managing Venturer of any

of the Joint Venture Partnerships. The Freegard Partnerships have demonstrated that they suffered irreparable injury by turning over the management of the Joint Ventures to New Shurgard and monetary remedies are likely inadequate to compensate for that injury. The balance of hardships favors an equitable remedy, as it would make no sense to continue to permit New Shurgard to act as Managing Venturer when it is technically not even a Joint Venturer. Finally, the public interest would not be disserved by a permanent injunction. *Cf. eBay Inc. v. MercExchange, L.L.C.*, 126 S. Ct. at 1839.

The Freegard Partnerships are not, however, for the reasons suggested above, entitled to a permanent injunction prohibiting payments to Public Storage pursuant to the Management Agreements.

**V.      CONCLUSION**

For the reasons set forth above, the Freegard Partnerships' motion for summary judgment as to Counts I and II of the Amended Complaint will be granted in part and denied in part. As for Count I, the Court will enter a declaration to the effect that Old Shurgard committed a material default of the Joint Venture Agreements when it merged into, and transferred its interests in the Joint Ventures to, New Shurgard without the written consent of the Freegard Partnerships, and as a result New Shurgard is not properly the Managing Venturer of the Joint Venture Partnerships. With respect to Count II, the Freegard Partnerships are entitled to a permanent injunction prohibiting New Shurgard from holding itself out as the Managing Venturer of the Joint Ventures. In all other respects, the Freegard Partnerships' motion for summary judgment will be denied.

An appropriate Order will enter.

Thomas A. Wiseman, Jr.
Senior U.S. District Judge